920 P.2d 1017

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Reis LOPEZ, Defendant–Appellant.**

No. 22631.

Supreme Court of New Mexico.

May 29, 1996.

Rehearing Denied June 25, 1996.

T. Glenn Ellington, Chief Public Defender, Susan Gibbs, Assistant Appellate Defender, Santa Fe, for Appellant.

Tom Udall, Attorney General, Ann M. Harvey, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

FROST, Chief Justice.

1. Defendant–Appellant Reis Lopez appeals his convictions for felony murder, attempted armed robbery, and aggravated battery. Lopez contends that the trial court erred in failing to instruct the jury on an essential element of felony murder, that he was denied effective assistance of counsel, and that his conviction and sentence for both felony murder and the predicate felony of attempted armed robbery violated the Double Jeopardy Clause. We affirm in part, reverse in part, and remand.

## I. FACTS

2. On April 16, 1993, Marion Ionita, a Romanian immigrant, was working at a gas station in Belen, New Mexico. Mihai Ciup, the uncle of Ionita's brother-in-law, was also at the station, keeping Ionita company. Ionita was standing behind a counter near the cash register when, shortly after 1:00 p.m., Lopez entered the gas station armed with a rifle. Lopez pointed the rifle at Ionita and demanded money. Ionita asked Ciup in Romanian whether he thought the gunman was serious. Lopez then fired a shot into the wall behind Ionita.

3. The testimony of the two sides differs as to what happened next. Ionita, testifying for the Prosecution, stated that, after the first shot, he threw himself to the floor and crouched behind a chair. Ionita testified that Lopez continued shooting at him, wounding him in the arm and wrist. Ionita stated that Lopez then turned, pointed the gun toward the front door and fired two or three times. While Lopez was looking at the front door, Ionita stated that he attempted to throw the chair at Lopez and then rushed from behind the counter and grabbed for the

gun. During the ensuing struggle, Ionita was shot again, this time in the leg. The struggle ended when Lopez lost possession of the rifle and fell through a plate-glass window at the front of the station. Lopez then fled into a nearby alley. Ciup was found dead, just outside the doorway, shot twice in the chest. Ionita testified that he did not know how Ciup ended up outside the doorway, but speculated that when Lopez came in, Ciup exited the station through the adjoining garage, circled around, and attempted to reenter the station through the front door to surprise Lopez.

4. Lopez presented a different account of the events. He testified that he fired the first shot into the wall behind Ionita to prove that he was serious about the robbery. He stated that Ionita immediately picked up and threw the chair at him and then rushed him. He stated that he then shot at Ionita as Ionita came at him. He further testified that he could not remember what happened during the struggle with Ionita, but he suggested that any other shots fired occurred accidentally as he and Ionita struggled over the gun. Lopez testified that he saw Ciup when he first entered the station, but that Ciup disappeared, and Lopez did not remember seeing him again during the robbery attempt.

5. Several witnesses were driving by the station at the time and noticed the struggle. They testified that they saw Ciup collapse outside the doorway a few moments before Lopez fell through the plate-glass window. The witnesses then saw Lopez flee down a nearby alley. These witnesses were able to direct the police who found Lopez sitting down in the alley in a stupor. The police found shell casings inside the station indicating that a total of nine shots had been fired. The police also determined that at least one wild shot was fired into the ceiling, presumably during the struggle over the gun.

6. Lopez was subsequently arrested, and, in November 1994, he was tried for first-degree felony murder, attempted armed robbery, and aggravated battery. After both sides presented evidence, the State tendered an instruction on felony murder for the court to give to the jury. This instruction provided that, to convict Lopez for felony murder, the jury need only find the following elements:

1. The defendant attempted to commit the crime of Armed Robbery under circumstances or in a manner dangerous to human life;

2. During the attempt to commit Armed Robbery, the defendant caused the death of Mihai Ciup;

3. This happened in New Mexico on or about the 16th day of April, 1993.

This instruction did not contain any mens-rea element. In reviewing this instruction, the trial judge asked both attorneys if there should be an intent instruction for felony murder, to which the prosecutor replied no. Defense counsel for Lopez did not object to this instruction. Lopez's counsel did tender additional instructions on all lesser-included offenses to murder, which the trial court rejected on the grounds that the instructions were not supported by the evidence.

7. The jury convicted Lopez of first-degree felony murder, for which Lopez received a sentence of life imprisonment, and of attempted armed robbery and aggravated battery, for which no sentences have yet been entered. Lopez now appeals his conviction, arguing (1) that the trial court failed to instruct the jury on an essential element of felony murder; (2) that he was denied effective assistance of counsel because his attorney failed to object to the felony-murder instruction; and (3) that his conviction for both felony murder and attempted armed robbery violated the Double Jeopardy Clause. We note proper jurisdiction over this appeal, SCRA 1986, 12–102(A)(2) (Cum. Supp.1995) (appeal from sentence of life imprisonment), and we affirm Lopez's felony-murder and aggravated battery convictions and reverse his attempted armed robbery conviction.

## II. IMPROPER FELONY MURDER INSTRUCTION

### A. Felony–Murder Doctrine

■ 8. In 1991 this Court, in *State v. Ortega*, 112 N.M. 554, 563, 817 P.2d 1196, 1205 (1991), imposed a mens rea requirement for felony murder. We explained:

Under the [felony-murder statute], proof that a killing occurred during the commission or attempted commission of a felony will no longer suffice to establish murder in the first degree. In addition to proof that the defendant *caused* (or aided and abetted) the killing, there must be proof that the defendant *intended* to kill (or was knowingly heedless that death might result from his conduct). An unintentional or accidental killing will not suffice.

*Id.* (citations omitted). We reaffirmed this holding in *State v. Griffin,* 116 N.M. 689, 695, 866 P.2d 1156, 1162 (1993), in which we held, "The felony murder [mens rea] requirement is satisfied if there is proof that the defendant intended to kill, knew that his actions created a strong probability of death or great bodily harm ..., or acted in a manner greatly dangerous to the lives of others." In other words, the mens rea necessary to support a conviction for another type of murder generally would also support a felony-murder conviction. *Id.* Consequently, because of this mens-rea requirement, our felony-murder rule is best described as elevating the crime of second-degree murder to first-degree murder when the murder is committed during the course of a dangerous felony.

9. In the present case, the felony-murder instruction omitted this essential mens-rea requirement as set out in the *Ortega* line of cases. Accordingly, we must determine whether this omission of an essential element mandates reversal.[1]

**B. Omission of an Essential Element in a Jury Instruction**

■ 10. In *State v. Osborne,* 111 N.M. 654, 661–62, 808 P.2d 624, 631–32 (1991), this Court addressed the issue of failure to instruct the jury on an essential element of the

offense. We explained that this failure generally will constitute fundamental error mandating reversal. *Id.* at 662, 808 P.2d at 632. The State is quick to point out that, in this case, Lopez failed to object to the tendered instruction. However, we held in *Osborne* that reversal may be appropriate regardless of whether or not the defendant objected to the erroneous instruction. *Id.* We noted:

First, although a defendant may have contributed to the error by his own failures at trial, the defendant may not be held to have "created" the error.... [Under Rule 5–608(A)] it is the duty of the court, not the defendant, to instruct the jury on the essential elements of a crime. Second, it simply does not contravene the "orderly and equitable administration of justice" to ensure that the state has met its burden of proving each of the essential elements of a crime required for conviction. On the contrary, the orderly and equitable administration of justice *requires* that we correct any such error notwithstanding the defendant's responsibility for or complicity in the error.

*Id.* (citations omitted); *see* SCRA 1986, 5–608(A) (Repl.Pamp.1992) ("The court must instruct the jury upon all questions of law essential for a conviction of any crime submitted to the jury.").

■ 11. There is, however, an exception to this general rule that failure to include an essential element in an instruction for a crime constitutes fundamental error. This exception applies when the element that was omitted from the instruction was not at issue in the trial. *State v. Orosco,* 113 N.M. 780, 782, 833 P.2d 1146, 1148 (1992).

**C. Omitted Element Not at Issue**

12. In *Orosco,* we revisited the issue of whether failure to instruct on an essential

1. We are dismayed that, three years after we announced this rule in *Ortega,* the trial judge, the district attorney, and the public defender in this case still failed to appreciate the problem with the felony-murder instruction as tendered. Although this Court had not yet amended the Uniform Jury Instruction for felony murder at the time this case went to trial, we had already published three opinions addressing this exact issue. *See Ortega,* 112 N.M. at 569, 817 P.2d at 1211 (filed Sept. 3, 1991; noting problems with UJI for felony murder); *State v. Hernandez,* 115

N.M. 6, 22–23, 846 P.2d 312, 328–29 (1993) (filed Jan. 14, 1993; applying *Ortega* ); *Griffin,* 116 N.M. at 695, 866 P.2d at 1162 (filed Nov. 18, 1993; applying *Ortega* ). In addition, we had published for comment our proposed revisions to the jury instructions for felony murder reflecting the holding in *Ortega. See* Vol. 32, No. 28, SBB 567 (July 15, 1993). Attorneys and judges have an obligation to keep abreast of current changes in the law. *See* SCRA 1986, 16–101 & cmt. (Repl.Pamp.1995) (attorney competence).

element constituted fundamental error. *Orosco*, 113 N.M. at 783–84, 833 P.2d at 1149–50. We declined to hold that *Osborne* created a per se rule that omission of an essential element always mandated reversal. Instead we explained:

> The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done. Clearly, when a jury's finding that a defendant committed the alleged act, under the evidence in the case, necessarily includes or amounts to a finding on an element omitted from the jury's instructions, any doubt as to the reliability of the conviction is eliminated and the error cannot be said to be fundamental.

*Id.* at 784, 833 P.2d at 1150 (citations omitted).

■ 13. Accordingly, the question to be answered when an essential element has been omitted "is whether there was any evidence or suggestion in the facts, however slight, that could have put the [omitted element] in issue." *Id.* We will only affirm a case in which the trial court failed to instruct the jury on an essential element when, under the facts adduced at trial, that omitted element was "undisputed and indisputable," and no rational jury could have concluded otherwise. *Id.* at 786, 833 P.2d at 1152; *see also State v. Green*, 116 N.M. 273, 279 & n. 4, 861 P.2d 954, 960 & n. 4 (1993) (holding failure to instruct on essential element when that element was at issue in trial constituted fundamental error mandating reversal); *State v. Elmquist*, 114 N.M. 551, 555, 844 P.2d 131, 135 (Ct.App.1992) (noting that court must examine record to determine whether there was any evidence placing knowledge element at issue and holding that, because such evidence existed in the record, failure to instruct on element of knowledge constituted reversible error under *Orosco* ).

14. In the present case, the parties do not dispute that the jury instruction for felony murder omitted an essential element. The court failed to instruct the jury that it must find that Lopez intended to kill or knew that his acts created a strong probability of death or great bodily harm. *See* SCRA 1986, 14–202 (Cum.Supp.1995) (Uniform Jury Instruction for felony murder). Accordingly, we must determine whether there was any evidence, however slight, placing Lopez's mental state at issue.

15. Lopez contends that he did place his mental state at issue. He points out that his main defense at trial was that Ciup's death was accidental. Lopez did not dispute that he attempted to rob the station or that he shot Ionita. His defense was that Ciup was killed accidentally by two wild shots that occurred during his struggle with Ionita over the gun. He testified that when he did intentionally fire the gun, he did so only in Ionita's direction, once into the wall behind the counter to prove he was serious about the robbery and again at least once when Ionita rushed at him.

16. Lopez points out that his contention that Ciup was killed during the struggle is corroborated, to a limited degree, by the fact that witnesses outside the station testified that Ciup collapsed just moments before Lopez fell through the plate-glass window. This testimony suggests that Ciup could have been shot during the struggle that caused Lopez to fall through the window. Lopez also points to evidence that at least one wild shot was fired into the ceiling during the struggle over the gun and that another was fired into Ionita's leg.

■ 17. However, Lopez's testimony at trial conceded the mens-rea element. Lopez testified that he intentionally shot at Ionita when Ionita rushed at him from behind the counter. Although Ionita's testimony and Lopez's testimony differed as to whether Lopez began firing the rifle before or after Ionita threw the chair at Lopez, Lopez did not dispute that he tried to shoot Ionita just before the struggle. When asked if he thought it was dangerous to have shot at Ionita, Lopez responded yes. Lopez also acknowledged that he knew if he fired his rifle at someone it would kill that person.

■ 18. With this testimony, Lopez admitted that he shot at Ionita knowing that his acts created a strong probability of death or great bodily harm. This testimony con-

clusively established the mens rea requirement for second-degree murder. *See* NMSA 1978, § 30–2–1(B) (Repl.Pamp.1994) (providing that mens rea for second-degree murder is that defendant knew the lethal act created a strong probability of death or great bodily harm). Had Ionita died, Lopez would have been guilty of at least second-degree murder for killing Ionita. Lopez's testimony therefore demonstrated that he had the necessary mens rea for felony murder as well, because, as noted above, in order to prove felony murder, the State must prove that the defendant acted with the mens rea for at least second-degree murder. *Ortega*, 112 N.M. at 563, 817 P.2d at 1205.

19. Lopez counters that, although he did not dispute that he intentionally shot at Ionita, he did not admit that he intentionally shot at Ciup. He contends that, because he claimed at trial that Ciup's death was accidental, he placed his mens rea with respect to Ciup's killing at issue. However, Lopez's distinction between his mental state with respect to shooting Ionita and killing Ciup is of no legal consequence in this case.

### D. Doctrine of Transferred Intent

20. Our second-degree murder statute provides in relevant part: "[A] person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual *or another.*" Section 30–2–1(B) (emphasis added). Accordingly, to be guilty of second-degree murder, it is sufficient that the defendant have the necessary mens rea with respect to the individual toward whom the defendant's lethal act was directed. It is not necessary, however, that the defendant have this mens rea with respect to the actual victim of that act.

21. We explained in *State v. Fekete,* 120 N.M. 290, 296, 901 P.2d 708, 714 (1995), that the incorporation of the phrase "to cause the death of that person *or of another person*" in the mens rea element of the first-degree murder statute was designed to assimilate the common-law doctrine of trans-

ferred intent into our modern mens rea requirement. The same principle applies to the phrase "to that individual *or another*" in the second-degree murder statute. *See* § 30–2–1(B). We noted in *Fekete:*

The doctrine of transferred intent is a legal fiction that is used to hold a defendant criminally liable to the full extent of his or her criminal culpability. Traditionally, the transferred intent theory has been applied in so-called "bad aim" situations where a defendant, while intending to kill one person, accidentally kills an innocent bystander or another unintended victim.... Thus, the perpetrator's intent to kill or injure a specific victim transfers to the unintended victim.

... The purpose of the doctrine is to impose criminal liability upon an actor when he or she intends to commit a criminal act, and "the actual result differs from the result designed or contemplated only in that a different person or property was injured or affected." Model Penal Code § 2.03(2)(a) cmt. 3 (1985). Thus, when all of the elements of an offense are met, with the exception that the victim differs from the one the perpetrator intended to harm, criminal liability should be imposed.

*Id.* (citations omitted). Although *Fekete* addressed the doctrine of transferred intent for first-degree, premeditated murder, this doctrine is equally applicable to second-degree murder. *See, e.g., State v. Ochoa,* 61 N.M. 225, 227, 297 P.2d 1053, 1054 (1956) (finding transferred intent in second-degree murder case). Our Uniform Jury Instruction clearly states the law applicable in this case:

When one intends to kill or injure a certain person, and by mistake or accident kills a different person, the crime, if any, is the same as though the original intended victim had been killed. In such a case, the law regards the intent as transferred from the original intended victim to the actual victim.

SCRA 1986, 14–255 (for use with second-degree murder instruction, SCRA 1986, 14–210, when mens rea was directed at someone other than the victim). The second degree murder statute thus does not require that a

defendant have an intent to kill his or her victim. Nor does it require that a defendant know that his or her act creates a strong probability of death *to the actual victim.* Instead, the statute requires that the defendant know that the action creates a "strong probability of death to [the person killed] *or another.*" Section 30-2-1(B).

22. In arguing that Ciup was killed accidentally, Lopez attempts to inject a false issue. This is because the culpable act upon which his conviction rested was that of firing at Ionita; it was not the act of struggling over the gun. There is no dispute that Lopez's act of firing at Ionita precipitated the struggle that, according to Lopez's own testimony, wounded Ciup. Thus, there was a direct causal link between the shots directed at Ionita and Ciup's death. Moreover, the deadly struggle over the gun and the wounding of a bystander are the natural and probable consequences of the act of shooting at Ionita under these circumstances.

23. Lopez's own testimony confirmed that he knew that there was a strong probability that he would kill Ionita. Indeed, had Ionita died from the leg wound inflicted by Lopez during the struggle, there would be no question that Lopez would have been guilty of at least second-degree murder for that killing. We therefore conclude that Lopez possessed the requisite mental state at the moment that he committed the culpable act. Accordingly, we find that there was concurrence between the actus reus of firing at Ionita, and the requisite mens rea of knowledge of probability of death or great bodily harm to Ciup *or another. See* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 932-35 (3d ed. 1982) (noting requirement of concurrence between mens rea and actus reus).[2]

24. As we concluded in both *Ortega* and *Griffin,* the jury's finding that Lopez caused Ciup's death necessarily included a finding that Lopez had the requisite mental state for felony murder because that element was not in fact disputed in this case. *See Ortega,* 112 N.M. at 569, 817 P.2d at 1211 (affirming conviction despite failure to instruct on mens-rea requirement for felony murder); *Griffin,* 116 N.M. at 695, 866 P.2d at 1162 (same). "We 'not only have confidence in the jury's verdict ... we think it would be a miscarriage of justice to upset the verdict[ ] and remand for a new trial, the outcome of which most assuredly would be the same.'" *Griffin,* 116 N.M. at 695, 866 P.2d at 1162 (first alteration in original) (quoting *Ortega,* 112 N.M. at 566-67, 817 P.2d at 1208-09).[3]

---

**2.** We note that in the context of this case, our second degree murder statute's use of the phrase "or another" has an effect that is somewhat analogous to the common law doctrine of transferred intent. However, the phrase "transferred intent" does not accurately characterize the operation of Section 30-2-1(B) in this case. Instead, the term "transferred knowledge" is more appropriate in describing the function of the phrase "or another" in our murder statute. The *Model Penal Code* employs a similar device when conviction for an offense requires a mental state of knowledge, as our murder statute does. *See Model Penal Code* § 2.03 (1985) (noting requirement of causal relationship between conduct and result).

It is also important to note that the doctrine of transferred intent we discuss here, transferring the second-degree murder mens rea from the intended victim to the actual victim, is distinct from the concept of transferred intent we rejected in *Ortega. Ortega,* 112 N.M. at 561, 817 P.2d at 1203 (rejecting "transferred intent-constructive malice theory" of felony murder (quoting Nelson E. Roth & Scott E. Sundby, *The Felony–Murder Rule: A Doctrine at Constitutional Cross-*

roads, 70 Cornell L.Rev. 446, 469 (1985))). In *Ortega,* we repudiated the distinct felony-murder concept of transferred intent that irrebuttably imputed the mens rea required for the homicide from the mens rea necessary for the underlying felony. *Id.* In other words, a finding that Lopez intended to rob the station will not satisfy the mens rea requirement for felony-murder in Ciup's death, but a finding that Lopez intended to kill Ionita or knew that his acts created a strong probability of death for Ionita may be used to satisfy the mens rea requirement for felony-murder in Ciup's death.

**3.** In addition, a police officer testified for the State that Lopez said to him that he first shot at Ionita and "then another man [Ciup] came in and rushed him, so he shot him." This admission corroborated Ionita's version of the events. Lopez did not directly contradict this admission at trial. He only testified that he had no memory of what occurred once he began struggling with Ionita over the gun. Thus, the State also presented substantial evidence that Lopez intentionally shot at Ciup as well. Although this evidence is not entirely uncontested, it further reinforces our confidence in the jury's verdict.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

■ 25. Lopez next argues that he was denied effective assistance of counsel in violation of his state and federal constitutional rights because his attorney failed to object to the defective jury instructions. *See* U.S. Const. amend. VI; N.M. Const. art. II, § 14. To succeed on a claim of ineffective assistance of counsel, the defendant must prove that defense counsel did not exercise the skill of a reasonably competent attorney and that this incompetent representation prejudiced the defendant's case, rendering the trial court's results unreliable. *Duncan v. Kerby,* 115 N.M. 344, 348, 851 P.2d 466, 470 (1993). In this case, we need not examine whether defense counsel failed to exercise the skill of a reasonably competent attorney because we find that Lopez failed to establish that he suffered prejudice.

■ 26. The main question before us in this case is whether Lopez's allegedly incompetent representation "prejudiced his case such that but for counsel's error, there is a reasonable probability that the result of the conviction proceedings would have been different." *Id.* at 349, 851 P.2d at 471. As we explained above, Lopez's mens rea with respect to felony murder was conclusively established by his own testimony and was fully corroborated by the State's evidence. There was no evidence presented by either side that cast reasonable doubt upon the fact that Lopez fired his rifle at Ionita, knowing that his act created a strong probability of death or great bodily harm. As we have already stated, we conclude that the outcome of the trial would most assuredly have been the same had the jury been instructed on the omitted mens rea element.

## IV. DOUBLE JEOPARDY

27. Lopez's last argument is that his conviction for both felony murder and the predicate felony of attempted armed robbery constituted double jeopardy. We agree.

■ 28. We recently addressed this issue in *State v. Contreras,* 120 N.M. 486, 489, 903 P.2d 228, 231 (1995). We explained that appellate courts must undertake a two-part inquiry to determine whether multiple punishments have been imposed in violation of constitutional protections against double jeopardy. *Id.* "The first part of the inquiry involves the question whether the conduct underlying the offenses is unitary." *Id.* If we determine that the conduct is unitary, then "we must answer the [second] question whether our state legislature intended multiple punishments for unitary conduct." *Id.*

29. We explained in *Contreras,* "Conduct is separate and distinct and not unitary if 'events are sufficiently separated by either time or space,' or 'the quality and nature of the acts or . . . the objects and results involved' are distinguishable." *Id.* at 490, 903 P.2d at 232 (citations omitted) (quoting *Swafford v. State,* 112 N.M. 3, 13–14, 810 P.2d 1223, 1233–34 (1991)). In *Contreras,* the defendant stabbed the victim with a knife and then stole the dying victim's taxi cab and cellular phone. *Id.* at 488, 903 P.2d at 230. We held, "Applying these guidelines to the facts in the record, consistent with the instructions on which the verdict was rendered, we find that the armed robbery and the murder occurred simultaneously." *Id.* at 490, 903 P.2d at 232.

■ 30. As in *Contreras,* we conclude here that the attempted armed robbery and the murder occurred simultaneously. Lopez first fired his rifle into the wall behind Ionita to prove he was serious about the robbery attempt. Lopez then shot at and injured Ionita when Ionita resisted the robbery attempt, and he killed Ciup during the ensuing struggle. Lopez only abandoned his attempted robbery after he was disarmed by Ionita and was thrown out of the station through a plate-glass window. There was no separation of time or place between the attempted armed robbery and the murder. Additionally, we see no evidence that the object of the shooting served any purpose other than furthering the predicate felony and assisting in its completion. Accordingly, we conclude that Lopez's conduct was unitary for purposes of double-jeopardy analysis.

31. As for the second prong of the inquiry, whether the legislature intended multiple

punishments, we conclusively answered this question with respect to felony murder and the predicate felony in *Contreras.* We held, "[when] one's conduct is unitary, one cannot be convicted of and sentenced for both felony murder and the underlying felony. To hold otherwise would be to 'prescrib[e] greater punishment than the legislature intended' in violation of the Double Jeopardy Clause." *Id.* at 491, 903 P.2d at 233 (quoting *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983)).

32. The record before us in this case indicates that the trial court has entered a judgment convicting Lopez of felony-murder, attempted armed robbery, and aggravated battery. The trial court sentenced Lopez to life imprisonment for the felony-murder conviction, but has not yet entered sentences for the attempted armed-robbery conviction or the aggravated-battery conviction. However, the fact that the trial court has not sentenced Lopez for the predicate felony of attempted armed robbery does not affect our double-jeopardy analysis. As we stated in *Contreras:*

> It is not enough to say that the armed robbery merges with the felony murder or to allow the trial court to impose concurrent sentences for armed robbery and felony murder. ... [T]he second conviction is itself punishment that has potential adverse consequences. Thus allowing the conviction to stand or allowing sentencing on that conviction would impose multiple punishments in violation of the Double Jeopardy Clause.

*Id.* at 492, 903 P.2d at 234. Consequently, we reverse Lopez's conviction for the predicate felony of attempted armed robbery.

33. We note that Lopez's aggravated battery conviction for shooting Ionita was not used as a separate predicate felony in support of the felony-murder conviction. Accordingly, Lopez does not contend on appeal that this conviction should also be reversed as violating double jeopardy, nor could he. Aggravated battery does not contain the same elements as felony murder predicated on attempted armed robbery. *Compare* NMSA 1978, § 30–3–5 (Repl.Pamp.1994) (aggravated battery requires unlawful touching)

*with* NMSA 1978, § 30–3–5 (Repl.Pamp. 1994) (armed robbery requires theft of something of value); *Cf. State v. Cowden,* 121 N.M. 703, 917 P.2d 972 (Ct.App.1996) (No. 15,714) (filed Apr. 3, 1996) (noting aggravated battery contained different elements from assault with intent to commit violent felony, and conviction for both crimes did not violate double jeopardy). We therefore remand this case to the trial court to set aside Lopez's conviction for attempted armed robbery and to enter sentence for Lopez's aggravated battery conviction.

### V. CONCLUSION

34. For the foregoing reasons, we affirm Lopez's conviction for first-degree felony murder. The court's failure to instruct the jury on all essential elements in this case did not give rise to fundamental error, nor did defense counsel's failure to object to the instruction constitute ineffective assistance of counsel. We also affirm Lopez's aggravated battery conviction. However, we reverse the Lopez's conviction for attempted armed robbery as violating Lopez's right to be free from double jeopardy, and we remand this case to the trial court for further proceedings consistent with this opinion.

35. **IT IS SO ORDERED.**

FRANCHINI and MINZNER, JJ., concur.