THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TORRENCE W. SLATER, Defendant-Appellant.

Fourth District    No. 4—07—0966

Opinion filed June 26, 2009.—Modified on denial of rehearing September 21, 2009.

Michael J. Pelletier, Gary R. Peterson, and Ryan R. Wilson, all of State Appellate Defender's Office, of Springfield, for appellant.

Chris Reif, State's Attorney, of Jacksonville (Patrick Delfino, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

Following an August 2007 trial, a jury convicted defendant, Torrence W. Slater, of first degree murder (720 ILCS 5/9—1(a)(2) (West 2006)) and domestic battery (720 ILCS 5/12—3.2(a)(1) (West 2006)). In October 2007, the trial court sentenced defendant to 75 years in prison.

Defendant appeals, arguing (1) that the State failed to prove him guilty beyond a reasonable doubt of first degree murder based on the doctrine of transferred intent and (2) ineffective assistance of counsel in that his trial counsel failed to file a motion to sever the domestic-battery charge from the first degree murder charge. We disagree and affirm.

## I. BACKGROUND

In April 2007, the State charged defendant with (1) first degree murder of Patrick Anderson (720 ILCS 5/9—1(a)(2) (2006)) and (2)

domestic battery of Brandy Lovekamp (720 ILCS 5/12—3.2(a)(1) (West 2006)).

At defendant's August 2007 trial, the State presented testimony from (1) four eyewitnesses, (2) various police officers, (3) a forensic scientist, and (4) a forensic pathologist. That testimony showed the following.

On April 8, 2007, Brandy Lovekamp left the Jacksonville duplex that she shared with defendant, her boyfriend at the time. She returned later that evening to find defendant, Adam Oakley, defendant's friend, and Brenda Bourn, defendant's former girlfriend. Defendant was angry with Lovekamp because, in her words, "he thought I was out with somebody else the night before."

Later that night, at defendant's direction, Lovekamp, defendant, Oakley, and Bourn left the duplex in Lovekamp's car to drive to a location where a videotape or photograph purportedly showing Lovekamp kissing another man was present. As Lovekamp drove, defendant punched her in the nose. Defendant thereafter traded places with Lovekamp because she was bleeding and could not see. She thought her nose had been broken.

Defendant then drove back to their duplex so that Lovekamp could clean the blood off her face. After attempting to do so, Lovekamp joined defendant and Oakley on the porch, and she noticed that defendant's car, which was parked in the driveway, had its trunk open. Meanwhile, Bourn went back into the duplex.

While on the porch, Lovekamp saw a vehicle drive by, back up, and park in the front yard. A man, later identified as Dudley McClain, got out of the car and walked up to the duplex to try to sell something. Lovekamp walked off the porch to meet McClain, showed him her bloodied face, and told him that it "wasn't a good time" to be there. McClain then approached defendant, who told McClain that "[they] didn't want anything [and to] get the fuck out of the yard." Despite defendant's repeated orders, McClain did not leave. Thereafter, defendant retrieved a shotgun from the open trunk of his car.

With Lovekamp standing next to him, defendant fired the shotgun, but Lovekamp did not see the direction in which it was fired. McClain then turned to leave and was almost to his car when defendant fired a second shot. The State asked Lovekamp to mark a photograph to show the respective positions of defendant and McClain when the two shots were fired. Her markings showed that between the first and second shot, defendant walked toward McClain as McClain retreated toward his car. Further, at the time of the second shot, Lovekamp's markings showed that (1) defendant was only about 15 feet away from McClain, (2) McClain was standing next to his car, and (3) McClain was in a direct line between defendant and the car.

At trial, Lovekamp identified a 12-gauge shotgun with a pistol grip as the shotgun defendant fired that night. The police had discovered this shotgun three days after the shooting in an adjoining duplex apartment.

Bourn's testimony corroborated Lovekamp's account up to the time Bourn walked into the duplex. Bourn heard a "boom sound" when she was inside the duplex, so she looked out the door and saw defendant fire a second shot. Bourn also marked a photograph of the scene to show the respective positions of defendant, McClain, and the car at the time the second shot was fired. Those markings again showed that McClain was within a few feet of his car at that time and in a direct line between the car and defendant, who was approximately 20 feet away from McClain.

Oakley also corroborated Lovekamp's testimony, adding that (1) the trunk of defendant's car was open before McClain arrived, (2) he could not see where defendant was pointing the shotgun when defendant fired the first shot, and (3) the shotgun was pointed in a downward trajectory when defendant fired the second shot.

McClain testified that he was driving Patrick Anderson around Jacksonville about 2 a.m., trying to sell compact discs and find drugs. He said that he stopped at defendant's duplex because he thought he "heard somebody holler [his] name." McClain parked in front of the duplex and got out of his car from the driver's side. Meanwhile, Anderson remained in the front passenger seat. McClain's version of events was consistent with those of the other eyewitnesses. McClain testified that defendant fired the first shot into the air, but McClain did not see defendant fire the second shot because he had turned and was returning to his car. Soon after defendant fired the second shot, McClain got into his car and discovered that Anderson had been shot.

Three days after the shooting, investigators searched a separate, unoccupied residence that was attached to defendant's duplex. They found that (1) a fire had been set in the kitchen, (2) the residence was accessible from defendant's duplex through a hole in the basement wall, and (3) a 12-gauge shotgun with a pistol grip—which was loaded with three "slug" shotgun shells—had been partially hidden under a bucket in the basement.

The State's forensic pathologist testified that Anderson died from a gunshot wound to his face. Specifically, he died from brain trauma caused by a 12-gauge shotgun slug wound to his right cheek region.

The photographs marked by Lovekamp and Bourn were admitted into evidence and published to the jury. Defendant did not call any witnesses.

At defendant's request, the trial court instructed the jury on involuntary manslaughter (720 ILCS 5/9—3 (West 2006)), as well as first degree murder (720 ILCS 5/9—1(a)(2) (West 2006)). However, the jury convicted defendant of first degree murder and domestic battery (720 ILCS 5/12—3.2(a)(1) (West 2006)). The verdict form for first degree murder returned by the jury found defendant guilty of that offense "knowing his acts create [*sic*] a strong probability of death or great bodily harm to Patrick Anderson or another."

In October 2007, the trial court sentenced defendant to 75 years in prison on his conviction of first degree murder and 364 days in jail on his conviction of domestic battery and ordered those sentences to be served concurrently.

This appeal followed.

## II. ANALYSIS

### A. Defendant's Claim That the State Failed To Prove Him Guilty Beyond a Reasonable Doubt

Defendant argues that the State failed to prove him guilty beyond a reasonable doubt of first degree murder based on the doctrine of transferred intent. Specifically, defendant contends that his first degree murder conviction must be vacated because the State failed to present evidence that he either (1) knew Anderson was in McClain's car or (2) intended to kill McClain. We disagree.

### 1. *The Appropriate Standard of Review*

Initially, we note that defendant, citing *People v. Garriott*, 253 Ill. App. 3d 1048, 1050, 625 N.E.2d 780, 783 (1993), asserts that because the facts of this case are not in dispute, the appropriate standard of review is *de novo*. However, because our review of the record reveals that the jury had to resolve factual conflicts between the accounts of the eyewitnesses and draw reasonable inferences from those accounts—namely, at whom or at what defendant was firing, and where everyone was standing when the shots were fired—we view *Garriott* as inapposite.

In *People v. Jackson*, 232 Ill. 2d 246, 280-81, 903 N.E.2d 388, 406-07 (2009), the Supreme Court of Illinois explained the proper standard of review to employ when a defendant argues that the State's evidence was insufficient to sustain his conviction, as follows.

> "When a court reviews the sufficiency of the evidence, the relevant question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (Emphasis in original.) *Jackson v. Virginia*, 443

U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); [citations]. This standard of review does not allow the reviewing court to substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses. [Citations.] Further, reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial [citation], and circumstantial evidence meeting this standard is sufficient to sustain a criminal conviction [citation]. Thus, the standard of review gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' [Citations.]

'The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt.' [Citation.] Further, in weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt."

See also *People v. Saxon*, 374 Ill. App. 3d 409, 416, 871 N.E.2d 244, 251 (2007) (an inference is simply a reasonable deduction from the consideration of other facts that the fact finder may draw in its discretion but is not mandated to draw as a matter of law). Thus, in determining a defendant's guilt, the trier of fact is entitled to draw reasonable inferences that flow from the evidence presented. *People v. Kirkpatrick*, 365 Ill. App. 3d 927, 929-30, 851 N.E.2d 276, 279 (2006). As we next discuss, an issue in this case is what inferences the jury could have reasonably drawn from the facts as the jury determined those facts to be.

### 2. *The Sufficiency of the Evidence*

Defendant's argument that the State failed to prove him guilty beyond a reasonable doubt of first degree murder based on the doctrine of transferred intent requires us to first review Illinois law governing that offense.

### a. The Three "Types" of First Degree Murder

■ In Illinois, the offense of first degree murder is set forth in section 9—1(a) of the Criminal Code of 1961 (720 ILCS 5/9—1(a) (West 2006)), which provides:

"(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another; or

(3) he is attempting or committing a forcible felony other than second degree murder."

In *People v. Smith*, 233 Ill. 2d 1, 16, 906 N.E.2d 529, 537-38 (2009), the Supreme Court of Illinois recently analyzed this statute as follows:

"While our statute describes three 'types' of murder, first degree murder is a single offense. As we have explained on numerous occasions, ' "the different theories embodied in the first degree murder statute [citation] are merely different ways to commit the same crime." ' [Citations.] In other words, 'subsections (a)(1), (a)(2), and (a)(3) of section 9—1 of the Criminal Code, defining intentional murder, knowing murder[,] and felony murder, delineate only the mental state or conduct that must accompany the acts that cause a death.' "

See also *People v. Davis*, 233 Ill. 2d 244, 263, 909 N.E.2d 766, 776 (2009) (in which the supreme court again describes the "three different theories of first degree murder" as being intentional, knowing, and felony murder).

The Supreme Court of Illinois has previously referred to sections 9—1(a)(1) and (a)(2) as "intentional murder" and "knowing murder," respectively. For instance, in *People v. Davis*, 213 Ill. 2d 459, 471, 821 N.E.2d 1154, 1161 (2004), the court wrote the following: "[L]ack of an intent to kill for felony murder distinguishes it from the other forms of first degree murder, which require the State to prove either an intentional killing (720 ILCS 5/9—1(a)(1) (West 2002)) or a knowing killing (720 ILCS 5/9—1(a)(2) (West 2002))." In *People v. Fuller*, 205 Ill. 2d 308, 346-47, 793 N.E.2d 526, 550 (2002), the supreme court wrote that "[a]n intentional murder involves a more culpable mental state than knowing or felony murder."

We discuss these "types" of first degree murder because defendant was charged with and convicted in this case of "knowing murder"—that is, a violation of section 9—1(a)(2) of the Criminal Code (720 ILCS 5/9—1(a)(2) (West 2006)). Thus, to be precise in our analysis, we must address the question of whether the doctrine of transferred intent applies to "knowing murder." To resolve this matter, we further discuss the law governing "knowing murder."

### b. "Knowing Murder" in Illinois

Several cases have recently discussed the law governing "knowing murder," but in doing so, they did not use that term. In *People v.*

*Lemke*, 384 Ill. App. 3d 437, 445-46, 892 N.E.2d 1213, 1220 (2008), the Fifth District Appellate Court wrote the following:

> "A defendant commits first-degree murder under section 9—1(a)(2) of the Criminal Code of 1961 when in performing the acts that cause the death of an individual, 'he knows that such acts create a strong probability of death or great bodily harm.' 720 ILCS 5/9—1(a)(2) (West 2000). *** '[I]nferences as to [a] defendant's mental state are a matter particularly within the province of the jury.' [Citation.]
>
> It is well established that proof that a death resulted from a defendant's act of deliberately firing a gun in the general direction of his victim is sufficient to sustain a conviction for first-degree murder under section 9—1(a)(2). [Citations.] That is the case because it is not necessary to prove that the defendant had a specific intent to kill or do great bodily harm or that he knew with certainty that his acts would achieve murderous results. [Citation.] A person who is aware that his acts create a strong probability of death to another may be found guilty of first-degree murder under section 9—1(a)(2) even if the victim's death was 'caused "unintentionally." ' [Citation.]"

In *People v. Howery*, 178 Ill. 2d 1, 42, 687 N.E.2d 836, 856 (1997), the supreme court wrote the following about "knowing murder":

> "In order to prove murder, it is not necessary to show that the defendant had a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve murderous results. [Citations.] The requisite mental state for murder under section 9—1(a)(2) may be inferred from the facts and circumstances of the evidence. [Citations.] It is sufficient to show that the defendant voluntarily and willfully committed an act, the natural tendency of which was to destroy another's life."

See also *People v. Grimes*, 386 Ill. App. 3d 448, 453, 898 N.E.2d 768, 773 (2008) (when an individual intends to fire a gun, points it in the general direction of his intended victim, and shoots, such conduct is sufficient to sustain a conviction for first degree murder).

### c. "Knowing Murder" in This Case

Considered in light of the foregoing authority, defendant could hardly contest the sufficiency of the evidence to sustain his first degree murder conviction for "knowing murder" if he had shot and killed McClain. After all, the eyewitnesses testified that defendant was no more than 20 feet from McClain when defendant fired a shotgun in his direction, striking the car next to which McClain was standing. However, the person defendant killed with a blast from his shotgun was not McClain but Anderson, who was sitting in the car. The State

argued at the trial level and on appeal that this distinction should not matter—that defendant was still guilty of first degree murder—because the doctrine of transferred intent applies to this case.

Defendant disagrees, asserting that his first degree murder conviction must be reversed because the State was required to prove that defendant fired the shotgun at McClain, intending to kill him or cause him great bodily harm (that is, "intentional murder"), before the doctrine of transferred intent can apply. Defendant claims that no evidence shows that he (1) intended to shoot McClain or (2) knew anyone was in McClain's car. Instead, defendant asserts that the most that can be inferred is that he decided to shoot at McClain's car. Defendant states his argument as follows: "Because the State failed to show that [defendant] intended to shoot *** McClain, the doctrine of transferred intent cannot be used to convict [defendant] for the murder of Mr. Anderson, a man who only *** McClain knew was in the car."

To address defendant's contention, we turn our analysis to the doctrine of transferred intent.

### 3. The Doctrine of Transferred Intent—a Misnomer That Would Be Better Termed "Transferred Mental State"

■ The doctrine of transferred intent has a long history, both in Illinois and elsewhere. Sixty-two years ago, in *People v. Marshall*, 398 Ill. 256, 75 N.E.2d 310 (1947), the supreme court wrote that the law is well settled that where a person shoots at one with intent to kill and murder, but kills one whom he did not intend to injure, he is not absolved from answering for the crime of murder. (We note that *Marshall* predated the current Illinois criminal code, enacted in 1961, which substantially restructured Illinois homicide law.) See *People v. Thompson*, 313 Ill. App. 3d 510, 516, 730 N.E.2d 118, 123 (2000) ("Under the doctrine of transferred intent, if a defendant shoots at one person, with the intent to kill, but kills an unintended victim, he may be convicted of the crime of murder for the death of the unintended victim"); see also *People v. Lenius*, 293 Ill. App. 3d 519, 539, 688 N.E.2d 705, 718 (1997) ("Under the doctrine of transferred intent, a defendant's intent to kill the intended victim is transferred to the actual victim").

However, as we discussed earlier in this opinion, Illinois law is clear that "to prove murder, it is not necessary to show that the defendant had a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve murderous results." *Howery*, 178 Ill. 2d at 42, 687 N.E.2d at 856. Instead, as charged in this case, a defendant can commit "knowing murder"—that is, first

degree murder under section 9—1(a)(2) of the Criminal Code—when, in performing the acts that caused the death of an individual, "he knows that such acts create a strong probability of death or great bodily harm." 720 ILCS 5/9—1(a)(2) (West 2006).

We earlier mentioned that had McClain been the victim of defendant's shooting instead of Anderson, the evidence of defendant's guilt of first degree murder under section 9—1(a)(2) of the Criminal Code would have been overwhelming even in the total absence of any evidence that defendant *intended* to kill McClain or cause him great bodily harm. Under this "knowing murder" analysis, the only mental state of defendant that the State would need to prove would be that defendant, in performing the acts that caused the death of McClain, knew that such acts created a strong probability of death or great bodily harm. The State would not have to prove that defendant *intended* to kill McClain.

■ The question then raised by this appeal is the following: Is evidence of defendant's mental state that would have been sufficient to prove him guilty of "knowing murder"—that is, the first degree murder of McClain under section 9—1(a)(2) of the Criminal Code— also sufficient to prove him guilty of first degree murder of Anderson, the passenger in the car? We hold that it is and that the doctrine of transferred intent applies to "knowing murder" as charged under section 9—1(a)(2) of the Criminal Code.

We find support for this conclusion in the recent decision of the United State Supreme Court in *Dean v. United States*, 566 U.S. 568, 173 L. Ed. 2d. 785, 129 S. Ct. 1849 (2009). In *Dean*, the Court was construing a statutory provision that mandated extra punishment for the discharge of a gun during certain crimes. The Court had to decide whether Congress intended the extra punishment to apply when the gun goes off accidently. *Dean*, 566 U.S. at 570, 173 L. Ed. 2d at 790, 129 S. Ct. at 1852. The Court decided the answer was yes, explaining its decision as follows:

"It is unusual to impose criminal punishment for the consequences of purely accidental conduct. But it is not unusual to punish individuals for the unintended consequences of their *unlawful* acts." (Emphasis in original.) *Dean*, 566 U.S. at 575, 173 L. Ed. 2d at 794, 129 S. Ct. at 1855.

So it is with this case. It is not unusual to punish defendant for the unintended consequence—the death of Anderson—of defendant's *unlawful* act—namely, firing the shotgun in the direction of McClain under the circumstances of this case.

We recognize that part of the difficulty in applying the doctrine of transferred intent to the facts of this case is the very name of that

doctrine—namely, "transferred intent." In fact, under Illinois law, nothing requires the mental state of "intent" for any defendant to be guilty under the doctrine of transferred intent. (An exception, of course, to that statement is that some offenses, like attempt (first degree murder), are specific intent offenses, which, in the case of attempt (first degree murder), requires "proof of nothing less than intent to kill" to convict. See *People v. Hopp*, 209 Ill. 2d 1, 13, 805 N.E.2d 1190, 1197 (2004).) Thus, the term "transferred intent" is a misnomer. A more accurate term for the doctrine would be "transferred mental state."

In fact, the Supreme Court of California has so held (applying, of course, California law). In *People v. Bland*, 28 Cal. 4th 313, 319 n.1, 48 P.3d 1107, 1111 n.1, 121 Cal. Rptr. 2d 546, 550 n.1 (2002), that court discussed the doctrine of transferred intent as follows:

> "The term 'transferred intent,' if taken literally, is underinclusive. In his concurring opinion in *Scott*, Justice Mosk suggested that the term 'transferred malice' might be more accurate [citation] but even that term is too narrow. *** A more accurate designation might be 'transferred mental state.' However, because the term 'transferred intent' is so well established in cases, we will continue to use it on the understanding that it is not limited merely to intent but extends at least to premeditation."

### 4. *The Experience in Other States of Applying the Doctrine of Transferred Intent to "Knowing Murder"*

Other states have similarly dealt with the issue of applying the doctrine of transferred intent to "knowing murder." An instructive case is *State v. Lopez*, 1996—NMSC—036, 122 N.M. 63, 920 P.2d 1017, in which the Supreme Court of New Mexico construed that state's second-degree murder statute in a transferred-intent context. In pertinent part, that statute provides as follows:

> "[A] person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another." N.M. Stat. Ann. §30—2—1(B) (1994).

The construction of this statute by the New Mexico Supreme Court is particularly helpful and interesting because "knowing murder," as defined by section 9—1(a)(2) of the Illinois Criminal Code, is almost identical to this New Mexico statute, even though the offense in New Mexico is called second degree murder, while in Illinois it is called first degree murder.

In *Lopez*, Marion Ionita, a Romanian immigrant, was working at a gas station, and Mihai Ciup, a distant relation, was keeping Ionita

company. Defendant entered the gas station armed with a rifle, pointed it at Ionita, and demanded money. Ionita asked Ciup in Romanian whether he thought the gunman was serious, and the gunman then fired a shot into the wall behind Ionita. *Lopez*, 1996—NMSC—036, ¶2, 122 N.M. 63, 920 P.2d 1017. The testimony of Ionita and the defendant differed as to what happened next. Ionita said he threw himself on the floor and crouched behind a chair as the defendant continued shooting at him, wounding him in the arm and wrist. Ionita then rushed from behind the counter and grabbed for the gun. In the struggle, Ionita was shot in the leg. Ionita also saw the defendant shoot toward the front door. *Lopez*, 1996—NMSC—036, ¶3, 122 N.M. 63, 920 P.2d 1017.

The defendant testified that he fired the first shot into the wall behind Ionita to prove that he was serious about the robbery. He claimed that Ionita threw a chair at him and then rushed him, and the defendant shot Ionita as he came at him. The defendant claimed to not recall what happened during the struggle with Ionita but suggested that any other shots fired occurred accidently as he and Ionita struggled over the gun.

The defendant fled the gas station when he lost possession of the rifle. Ciup was found dead, just outside the doorway, shot twice in the chest. Ionita did not know how Ciup ended up outside the doorway. *Lopez*, 1996—NMSC—036, ¶3, 122 N.M. 63, 920 P.2d 1017.

The New Mexico Supreme Court noted that the defendant admitted he shot at Ionita knowing that his acts created a strong probability of death or great bodily harm. The court pointed out that this conclusively established the *mens rea* requirement for second degree murder. *Lopez*, 1996—NMSC—036, ¶17, 122 N.M. 63, 920 P.2d 1017. The court further observed that "[h]ad Ionita died, Lopez would have been guilty of at least second-degree murder for killing Ionita." *Lopez*, 1996—NMSC—036, ¶18, 122 N.M. 63, 920 P.2d 1017.

Although the defendant did not dispute that he intentionally shot at Ionita, he did not admit that he intentionally shot at Ciup. The court concluded, however, that "[defendant's] distinction between his mental state with respect to shooting Ionita and killing Ciup is of no legal consequence in this case." *Lopez*, 1996—NMSC—036, ¶19, 122 N.M. 63, 920 P.2d 1017. Discussing the doctrine of transferred intent in a second degree murder context, the supreme court wrote, "[I]t is sufficient that the defendant had the necessary mens rea with respect to the individual toward whom the defendant's lethal act was directed. It is not necessary, however, that the defendant have this mens rea with respect to the actual victim of [the] act." *Lopez*, 1996—NMSC—036, ¶20, 122 N.M. 63, 920 P.2d 1017. The supreme court explained why this was so, as follows:

"We explained in *State v. Fekete*, 120 N.M. 290, 296, 901 P.2d 708, 714 (1995), that the incorporation of the phrase 'to cause the death of that person *or of another person*' in the mens rea element of the first-degree murder statute was designed to assimilate the common-law doctrine of transferred intent into our modern mens rea requirement. The same principle applies to the phrase 'to that individual *or another*' in the second-degree murder statute. See §30—2—1(B). We noted in *Fekete*:

> 'The doctrine of transferred intent is a legal fiction that is used to hold a defendant criminally liable to the full extent of his or her criminal culpability. Traditionally, the transferred intent theory has been applied in so-called 'bad aim' situations where a defendant, while intending to kill one person, accidentally kills an innocent bystander or another unintended victim.... Thus, the perpetrator's intent to kill or injure a specific victim transfers to the unintended victim.'
> ***

[Citation.] Although *Fekete* addressed the doctrine of transferred intent for first-degree, premeditated murder, this doctrine is equally applicable to second-degree murder. *** [Citation.] The second degree murder statute *** does not require that a defendant have an intent to kill his or her victim. Nor does it require that a defendant know that his or her act creates a strong probability of death *to the actual victim*. Instead, the statute requires that the defendant know that the action creates a 'strong probability of death to [the person killed] *or another*.' Section 30—2—1—(B).

In arguing that Ciup was killed accidentally, [defendant] attempts to inject a false issue. This is because the culpable act upon which his conviction rested was that of firing at Ionita; it was not the act of struggling over the gun. There is no dispute that Lopez's act of firing at Ionita precipitated the struggle that, according to Lopez's own testimony, wounded Ciup. Thus, there was a direct causal link between the shots directed at Ionita and Ciup's death. Moreover, the deadly struggle over the gun and the wounding of a bystander are the natural and probable consequences of the act of shooting at Ionita under these circumstances.

*** We therefore conclude that [defendant] possessed the requisite mental state at the moment that he committed the culpable act. Accordingly, we find that there was concurrence between the actus reus of firing at Ionita, and the requisite mens rea of knowledge of probability of death or great bodily harm to Ciup *or another*." (Emphasis in original.) *Lopez*, 1996—NMSC—036, ¶¶21-23, 122 N.M. 63, 920 P.2d 1017.

In a footnote, the supreme court also noted that the phrase "transferred intent" is a misnomer, explaining as follows:

"We note that in the context of this case, our second degree murder statute's use of the phrase 'or another' has an effect that is somewhat analogous to the common[-]law doctrine of transferred intent. However, the phrase 'transferred intent' does not accurately characterize the operation of [s]ection 30—2—1(B) in this case. Instead, the term 'transferred knowledge' is more appropriate in describing the function of the phrase 'or another' in our murder statute." *Lopez*, 1996—NMSC—036, ¶23 n.2, 122 N.M. 63, 920 P.2d 1017.

### 5. *The Doctrine of Transferred Intent As Applied to the "Knowing Murder" in This Case*

■ We agree with the New Mexico Supreme Court's well-reasoned analysis and conclude that it applies fully to "knowing murder" under section 9—1(a)(2) of the Criminal Code. 720 ILCS 5/9—1(a)(2) (West 2006). We also agree with the California Supreme Court's analysis in *Bland* and note that the doctrine of transferred intent is similarly underinclusive under Illinois law. That is, the doctrine applies to more statutory definitions of first degree murder than just section 9—1(a)(1) of the Criminal Code, which is "intentional murder."

Applying the New Mexico's Supreme Court's well-reasoned analysis in *Lopez* to the present case, it is sufficient that defendant had the necessary *mens rea* for first degree murder—that is, "knowing murder"—with respect to McClain, the individual toward whom defendant's lethal act was directed. Defendant did not need to have the same *mens rea* with respect to Anderson, who was the actual victim of defendant's shooting. Further, the evidence showed a direct causal link between the shots directed at McClain and Anderson's death. The shooting of Anderson, the bystander as he sat in the car next to which McClain was standing, was a natural and probable consequence of the act of defendant's shooting at McClain under the circumstances of this case.

### 6. *Defendant's Petition for Rehearing*

After we filed our opinion in this case, defendant filed a petition for rehearing. In that petition, he made the following argument: "Rehearing should be granted because this [c]ourt's holding, finding transferred intent was applicable to a 'knowing mental state[,]' conflicts with the instructions given to the jury requiring a finding of intent." Specifically, defendant contends that the jury "could not rest [defendant's] conviction on its belief that knowing murder had been committed. It was required [by the instruction defining transferred intent] to find that [defendant] intended to harm either [McClain or Anderson]." We are unpersuaded.

We earlier concluded that under Illinois law, nothing requires the mental state of "intent" for any defendant to be guilty under the doctrine of transferred intent. Thus, evidence of the "knowing murder" that defendant committed in this case was sufficient to sustain defendant's conviction of first degree murder.

We acknowledge that this decision is a matter of first impression in Illinois. Thus, we can understand why the trial court instructed the jury as it did—namely, explaining how the doctrine of transferred intent applies to situations in which one "unlawfully *intends* to harm an individual but instead accidently harms an unintended victim." (Emphasis added.) However, given our decision in this case, the burden the instruction placed upon the State was not correct. That is, the State should not have been required to prove that defendant unlawfully *intended* to harm an individual. Instead, as we concluded earlier, "knowing murder" would be sufficient to sustain the State's burden of proof.

Nonetheless, the jury still found defendant guilty of first degree murder even though the burden placed upon the State by the instruction defining transferred intent was greater than it should have been. That the burden this instruction placed upon the State was greater than it should have been is not a complaint that defendant can make on appeal that will lead us to reverse his conviction.

### B. Defendant's Ineffective-Assistance-of-Counsel Claim

Defendant next argues that he received ineffective assistance of counsel because his trial counsel failed to file a motion to sever the domestic-battery charge from the first degree murder charge. We disagree.

### 1. *Ineffective Assistance of Counsel*

To prevail on a claim that counsel provided ineffective assistance, a defendant must demonstrate that (1) counsel's representation was so deficient that it was objectively unreasonable and (2) the deficient performance so prejudiced him that he was denied a fair trial. *People v. Perry*, 224 Ill. 2d 312, 341, 864 N.E.2d 196, 214 (2007), citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). In other words, "the defendant must show that counsel's errors were so serious, and his performance so deficient, that he did not function as the 'counsel' guaranteed by the sixth amendment." *Perry*, 224 Ill. 2d at 342, 864 N.E.2d at 214-15. "If either prong of the *Strickland* test is not met, defendant's claim must fail." *Perry*, 224 Ill. 2d at 342, 864 N.E.2d at 215.

A reviewing court need not consider counsel's performance before deciding whether defendant was prejudiced. *People v. Pineda*, 373 Ill.

App. 3d 113, 117, 867 N.E.2d 1267, 1272 (2007). To establish prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

## 2. *Joinder of Offenses*

■ A defendant may be tried in one proceeding for separate offenses if the offenses are based on (1) the same act or (2) separate acts that are part of the same comprehensive scheme. 725 ILCS 5/111—4 (West 2006). No precise criteria exist for determining whether separate offenses are part of the same comprehensive scheme. *People v. Trail*, 197 Ill. App. 3d 742, 746, 555 N.E.2d 68, 71 (1990). Nevertheless, this court has identified several factors that are indicative of a comprehensive scheme, which include, in part, the following: (1) proximity of time and location of the offenses and (2) the identity of evidence needed to demonstrate a link between the offenses. *Trail*, 197 Ill. App. 3d at 746, 555 N.E.2d at 71.

## 3. *Joinder in This Case*

Here, the State charged defendant with first degree murder and domestic battery, which occurred (1) at or near the same location and (2) within a very short time of each other. Further, regarding the identity of evidence needed to demonstrate a link between the offenses, the State could have presented evidence of the domestic battery even if it had been severed from the first degree murder charge. Specifically, the evidence pertaining to the domestic-violence charge would have been admissible as "other-crimes" evidence relating to the first degree murder charge under the continuing-narrative exception to the proscription against the admission of other-crimes evidence.

"[E]vidence of another crime is admissible if it is part of a continuing narrative of the event giving rise to the offense or, in other words, intertwined with the offense charged." *People v. Thompson*, 359 Ill. App. 3d 947, 951, 835 N.E.2d 933, 936 (2005). As this court has previously explained, when facts concerning other criminal conduct are part of a continuing narrative that relates to the circumstances attending the entire transaction, " 'they do not concern separate, distinct, and unconnected crimes.' " *Thompson*, 359 Ill. App. 3d at 951, 835 N.E.2d at 936, quoting *People v. Collette*, 217 Ill. App. 3d 465, 472, 577 N.E.2d 550, 555 (1991). Indeed, other-crimes evidence is admissible as part of a continuing narrative to explain aspects of the

crime that would otherwise be implausible or inexplicable. *People v. Johnson*, 368 Ill. App. 3d 1146, 1155-56, 859 N.E.2d 290, 299 (2006).

When evidence of other crimes is admissible, "the potential prejudice to a defendant of having the jury *decide* two separate charges is greatly diminished because the jury is going to be receiving evidence about both charges anyway." (Emphasis in original.) *Trail*, 197 Ill. App. 3d at 746, 555 N.E.2d at 71.

Turning to the merits of defendant's contention, even if the charges in this case had been severed, the continuing-narrative exception would have applied to the admission of the domestic-battery charge as other-crimes evidence because, without that evidence, defendant's (1) hostile reaction to McClain and (2) shooting at McClain simply because he would not leave his property quickly enough were otherwise inexplicable. At trial, defendant argued that he did not intend to kill McClain when he fired the shotgun. Without telling the jury the whole story—which included the circumstances surrounding the domestic battery to show why defendant was so angry—his shooting at McClain might be viewed by the jury as inexplicable.

■ Defendant's contention that counsel was ineffective is based on counsel's failure to file a motion to sever. Had counsel done so, the State could have presented the same evidence it did at trial to show that the continuing-narrative exception applied in this case. Specifically, the State would have presented its theory that (1) defendant was angry at Lovekamp because he thought she had kissed another man; (2) defendant was so angry at Lovekamp that he punched her in the face, breaking her nose; (3) defendant had opened the trunk of his car, which contained the shotgun, at some point before McClain arrived and in his fit of rage, planned to (a) use or (b) threaten to use the shotgun against Lovekamp; (4) defendant's anger had not subsided in the short time before McClain arrived; and (5) defendant was so angry that he lashed out at McClain, who unfortunately (particularly for Anderson) arrived at a most inopportune time.

Thus, the first degree murder and domestic battery occurred at or near the same location and within a very short time of each other. As a result, the domestic-battery evidence would have been admissible under the continuing-narrative exception had the only charge before the jury been first degree murder. Therefore, following *Trail*, we conclude that defendant's first degree murder and domestic-battery charges were properly joined. Because we have concluded that joining the first degree murder and domestic-battery charges was proper—and thus, defendant could not have been prejudiced by such joinder—defendant's counsel could not have been ineffective for failing to request that the charges be severed.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal.

Affirmed.

MYERSCOUGH and APPLETON, JJ., concur.