This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                              **NO.   32,773**

**GLENN LOPEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF RIO ARRIBA COUNTY**
**Stephen Pfeffer, District Judge**

Hector H. Balderas, Attorney General
Yvonne M. Chicoine, Assistant Attorney General
Santa Fe, NM

for Appellee

Jorge A. Alvarado, Chief Public Defender
Nicole S. Murray, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**KENNEDY, Judge.**

{1}     Glenn Lopez (Defendant) was convicted of criminal sexual penetration (CSP) and fourth-degree criminal sexual contact (CSC).  The CSC instruction given to the jury at trial exactly follows the uniform jury instruction for misdemeanor CSC.  Defendant therefore appeals the felony CSC conviction, asserting fundamental error.  He argues that the CSC instruction given at trial omitted an essential element of the crime, reflecting only misdemeanor CSC, rather than fourth-degree CSC.  We agree, but hold there is no error requiring reversal of his felony conviction.  He also contends that conviction for both offenses constitutes a violation of double jeopardy. We disagree and affirm his convictions.

## I.     BACKGROUND

### A.     The Night of the Incident

{2}     In October 2010, Defendant, Daniel Romero, E.M., Liza Martinez, and Veronica Aguilar attended a Halloween party.  These individuals all knew each other to some degree.  E.M. arrived at the party around midnight and, after she and the others had been drinking for some time, she eventually blacked out while sitting in the living room at the party.[1]

{3}     The contested facts at trial dealt with what occurred during the time E.M. was blacked out.  Martinez was the State's main witness on these facts.  At approximately

---

[1]E.M. testified that she could not remember anything during her blackout, which lasted from the time that she sat down on a couch at the party to the time that she woke up the next morning.

2

4:00 a.m., Defendant, Martinez, E.M., Romero, and Aguilar left the party. At this point, E.M., Romero, and Aguilar were "passed out" and could not walk to or from the car on their own. Everyone except Defendant had planned to spend the night at Romero's house, but Martinez, who had been designated as the driver of the group, was unsuccessful in her attempts to get driving directions from an incoherent Romero. Defendant was Romero's neighbor and arranged to give them directions in exchange for a ride home.

{4}     Either by Defendant's design or mutual agreement, Martinez drove everyone to what turned out to be Defendant's house. Martinez and Defendant assisted everyone into the house and left E.M. lying face down on the floor of the living room in case she got sick during the night. Eventually, Defendant retired to his bedroom and Martinez laid down on a couch in the living room.

{5}     Shortly after Martinez laid down, Defendant came into the living room completely naked. He pulled off E.M.'s bottoms, laid on top of her, and began "humping" her. To stop this, Martinez turned on the light, at which point, Defendant appeared to be asleep. Martinez began kicking Defendant in an attempt to get him away from E.M., and he eventually got up and went back to his bedroom.

{6}     Martinez fell asleep on the couch and, when she woke up, she saw E.M. in the same position, with Defendant again on top of making humping motions as though he was having sex with her from behind. This time, Martinez's verbal attempts to intervene and

get Defendant away from E.M. were unsuccessful. Intending to get help, Martinez left the house and unsuccessfully searched for better cell phone reception or a neighbor willing to help.[2] Her efforts were unavailing.

{7} Returning to Defendant's house, Martinez found that the lights, which she had left on, were turned off, and the front door was locked. Through a window in the front door, however, she could see into the living room. It was through this window that Martinez saw Defendant on top of E.M. Martinez pounded on the door until Aguilar opened it.[3] Defendant behaved as though he was asleep while Aguilar opened the door. Martinez warned Defendant, who was still lying next to E.M. and appeared to be asleep, she would stay awake until the others woke up in order to keep him from coming near E.M. again. Defendant subsequently returned to his bedroom.

{8} E.M. woke up the next morning, lying face down on the floor. She was not wearing her bottoms and her bra was unhooked. When she went to the bathroom, she experienced pain when urinating and discovered vaginal bleeding. E.M. also discovered that she had small bruises, commonly referred to as "hickies," on her neck. When the others

---

[2]Martinez testified that she first left the house in order to get better cell service. Unsuccessful, she then decided to return to the house where the party was and ask for help. The people hosting the party declined to help. She did not approach any other neighbors.

[3]Aguilar immediately returned to a couch and fell asleep.

4

woke up,[4] Martinez, E.M., Aguilar, and Romero left Defendant's house. When E.M. heard Martinez's account of the night before, E.M. vaguely remembered laying on her right side with her eyes closed and feeling someone behind her touching her butt and breasts, and a male voice whispering "Linda, Linda" and "Baby" in her left ear while rubbing his facial hair against her cheek. In response, she remembered shaking her head, saying "uh-uh" and trying to push someone away from her. E.M. immediately sought medical attention and reported the incident to the police that morning.

**B.    Procedural History**

{9}    Count 1 of the grand jury indictment charged Defendant with CSP under NMSA 1978, Section 30-9-11(F) (2009), and Count 2 charged him with CSC under NMSA 1978, Section 30-9-12(C)(1) (1993).[5] Section 30-9-12(C)(1) provides: "Criminal sexual contact in the fourth degree consists of all criminal sexual contact perpetrated . . . by the use of force or coercion that results in personal injury to the victim[.]" The CSC instruction given to the jury in the case provided:

> For you to find the defendant guilty of criminal sexual contact as charged in Count 2, the State must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:

---

[4]There was conflicting testimony regarding who woke up first. E.M. and Martinez both testified that they were the first person in the living room to wake up.

[5]Count 2 of the grand jury indictment charged Defendant with having "unlawfully and intentionally touched[ed] or appl[ied] force, without consent, to the unclothed intimate parts of E.M., . . . by the use of force or coercion which resulted in personal injury . . . contrary to . . . Section 30-9-12C(1)."

5

1. The defendant touched or applied force to the unclothed "buttocks" or "breasts" of [E.M.] without [E.M.'s] consent;

2. [E.M.] was unconscious, asleep or physically helpless;

3. [D]efendant knew or had reason to know of the condition of [E.M.];

4. [E.M.] was 18 years of age or older;

5. The defendant's act was unlawful;

6. This happened in New Mexico on or about the 31st day of October, 2010.

A jury found Defendant guilty of CSP as charged in Count 1 and of CSC as charged in Count 2.

## II. DISCUSSION

### A. Jury Instruction

{10} Defendant correctly asserts that the instructions given to the jury on CSC omitted the essential element of injury to E.M., which differentiates the fourth-degree felony CSC of which he was convicted from misdemeanor CSC. Defendant failed to preserve this argument for appeal in the trial court or mention it in his first brief in this Court. We therefore review his claim only for fundamental error. *See State v. Sosa*, 1997-NMSC-032, ¶ 23, 123 N.M. 564, 943 P.2d 1017; Rule 12-216 NMRA.

{11} An error is fundamental when it goes to the foundation of the case or takes from the defendant a right which was essential to his or her defense and which no court

6

could or ought to permit him or her to waive. *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633. Fundamental error can occur when a trial court fails to properly instruct the jury on all essential elements of an offense. *State v. Osborne*, 1991-NMSC-032, ¶ 38, 111 N.M. 654, 808 P.2d 624 (stating that "the failure to instruct the jury on the essential elements of an offense constitutes fundamental error"). In order to constitute reversible fundamental error, an essential element that is omitted from the instructions proffered to the jury must be "factually in issue." *See State v. Orosco*, 1992-NMSC-006, ¶ 6, 113 N.M. 780, 833 P.2d 1146. In *Orosco*, the element omitted from the jury instructions—unlawfulness—was not factually in issue because it was not disputed. There was no claim or evidence that the action was anything other than unlawful, since the conduct alleged was altogether denied. *Id.* ¶¶ 9, 11 (stating that there was nothing in the facts to suggest that the illegal touching might have been for some lawful purpose, such as medical care or custodial care). Whether something was factually in issue depends on "whether there was any evidence or suggestion in the facts, however slight, that could have put the element . . . in issue." *Id.* ¶ 10.

{12} However, not every failure to instruct on an essential element is fundamental error. *Id.* ¶ 17. Failure to instruct on an essential element where there can be no dispute that the "missing element was established by the evidence at trial" does not require reversal for fundamental error. *See State v. Herrera*, 2014-NMCA-007, ¶ 17,

7

315 P.3d 343 (clarifying that where "it is clear that the missing element was established by the evidence at trial, the fact that the jury was not instructed on the element is not considered fundamental error"). To evaluate if an element was clearly established by evidence at trial, we look at "the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case[.]" *Id.* (internal quotation marks and citation omitted). Fundamental error warrants reversal only "if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *Id.* (internal quotation marks and citation omitted).

{13} We agree with Defendant that the CSC jury instruction given at trial omitted an essential element of fourth-degree felony CSC. Personal injury resulting from the contact is the sole distinguishing element between misdemeanor and felony CSC. *Compare* § 30-9-12(D) *with* § 30-9-12(C)(1). E.M. being injured is therefore an essential element to the fourth-degree CSC charge, ordinarily requiring inclusion in the jury instructions. To assess Defendant's claim for fundamental error, we ask whether E.M.'s injuries were factually in issue during trial. If they were, we must determine whether her injuries were so clearly proven at trial, there could be no dispute that the element was established.

**1. E.M.'s Injuries Were Not Factually in Issue During Trial**

8

**{14}** Defendant never disputed the existence of E.M.'s injuries, just whether E.M. had consented to sex and the severity of the injuries themselves. Defendant's failure to dispute the existence of E.M.'s injuries rendered them not "in issue." Defendant was aware that he was charged with felony, not misdemeanor, CSC. The grand jury indictment clearly lists injury among the elements for felony CSC and cites to the statutory subsection for felony CSC. As such, Defendant was aware throughout the trial that the State would have to prove, beyond a reasonable doubt, that E.M. sustained injuries. *See* UJI 14-908 NMRA. Despite being on notice and presented with evidence of E.M.'s injuries during the State's case, Defendant chose not to controvert the State's evidence regarding the existence of E.M.'s injuries. Because the existence of the injuries was not in dispute, they were not "in issue." *See Orosco*, 1992-NMSC-006, ¶ ¶ 9-11.

**{15}** Defendant "conducted a lengthy cross-examination of Julie Kalan, the Sexual Assault Nurse Examiner (SANE) nurse who examined E.M. the morning after the party, specifically as to whether the injuries were consistent with consensual sex, the time during which the injuries could have occurred, and the degree of severity of the injuries. Although Defendant questioned Kalan about the injuries being consistent with consensual sex, her testimony did not waiver from earlier statements that injury had occurred. Similarly, although cross-examined regarding when E.M. could have sustained her injuries, Kalan offered no additional or inconsistent testimony regarding

9

the timing of the injuries. She maintained that, although she could not approximate when the bruising on E.M.'s neck occurred, E.M.'s vaginal injuries had occurred recently.

{16} Defendant did not object to the State's proffer of Kalan as an expert, did not object to the State's tendering exhibits for admission, did not question Kalan as to the extent of her knowledge and training on these types of injuries and, in no way, rebutted the State's evidence that E.M. sustained injuries. During his closing arguments, Defendant again chose to argue the severity of the injuries and attack Kalan's credibility, rather than make any assertions regarding the existence of E.M.'s injuries.

{17} We recognize that any evidence presented on the issue of injury, however slight it may be, is sufficient to put that element "in issue." *See id.* ¶ 10. Although we conclude that the *existence* of E.M.'s injury was not in issue, we also acknowledge that the severity of E.M.'s injury may have been. However, if E.M.'s injuries were factually in issue during trial based on disputes as to the injuries' severity, the existence of personal injury was so thoroughly established during trial that no reversible fundamental error could exist.

**2. The Personal Injury Element Was Established Beyond a Reasonable Doubt**

{18} We affirm a case "in which the trial court failed to instruct the jury on an essential element when, under the facts adduced at trial, that omitted element was 'undisputed and indisputable,' and no rational jury could have concluded otherwise." *State v. Lopez*, 1996-NMSC-036, ¶ 13, 122 N.M. 63, 920 P.2d 1017. It appears from the record that the existence of E.M.'s injuries was undisputed, and no rational jury could therefore have concluded otherwise. Although the severity of the injuries was a subject of Defendant's cross-examination of Kalan, *any* "injury to a sexual or reproductive organ" is sufficient to establish injury under Section 30-9-12(C)(1). NMSA 1978, § 30-9-10(D) (2005) (defining "personal injury"); *see also* UJI 14-908 (referencing Section 30-9-10(D) for list of types of personal injuries).

{19} During trial, the State presented evidence of E.M.'s injuries through the testimony of E.M. herself, as well as the SANE nurse who examined E.M. E.M. testified that, when she woke up the morning after the party, her breasts hurt, she had bruising on her neck, and she experienced vaginal pain and bleeding. Julie Kalan, the SANE nurse who examined E.M. the morning after the party, testified in depth about E.M.'s injuries. She described bruising on E.M.'s neck and abrasions on her back. The State presented photographs of the bruising, which were taken during the examination, to the jury. Kalan opined that the bruising could have been caused by a hand or by a mouth sucking or biting the flesh. Kalan listed E.M.'s vaginal injuries—redness, tissue swelling, slight bleeding, an abrasion, and a torn hymen—and testified that these types of

11

injuries were consistent with non-consensual sex. She also characterized E.M.'s injuries as "acute," meaning recent, and "severe." The district court also admitted various exhibits documenting the injuries, including Kalan's written report and photographs of the bruising and abrasions. There was no dispute that such injuries existed; thus, we are satisfied that the State proved injury beyond a reasonable doubt.

{20} Examining the entire record and considering the element missing from the instruction in the context of the facts of the case, we cannot conclude that the omission of the injury element in the jury instruction resulted in any miscarriage of justice. Because the State conclusively established the injury element, we decline to reverse the conviction on the basis of fundamental error and affirm Defendant's conviction for felony CSC.

## B. Double Jeopardy

{21} We review the constitutional question of whether there has been a double jeopardy violation de novo. *State v. Andazola*, 2003-NMCA-146, ¶ 14, 134 N.M. 710, 82 P.3d 77. "Double jeopardy protects against multiple punishments for the same offense." *State v. Silvas*, 2015-NMSC-006, ¶ 8, 343 P.3d 616. In cases involving violations of multiple statutes or "double-description" cases, "the polestar guiding courts is the [L]egislature's intent to authorize multiple punishments for the same offense." *Swafford v. State*, 1991-NMSC-043, ¶ 9, 112 N.M. 3, 810 P.2d 1223. Because Defendant argues that his convictions under different statutes arise from the

12

same conduct, this is a double-description case. We use the two-part test articulated in *Swafford* in analyzing double-description cases. *Id.* ¶ 25. Under this test, we first consider whether the defendant's conduct, for which he was convicted, was unitary. If it is not, then there has been no double jeopardy violation. *State v. Swick*, 2012-NMSC-018, ¶ 11, 279 P.3d 747. If the conduct is unitary, we consider whether the Legislature intended to punish the two statutory crimes separately. *State v. Dominguez*, 2014-NMCA-064, ¶ 7, 327 P.3d 1092.

{22}    Conduct is not unitary when the acts are "separated by sufficient indicia of distinctness." *State v. Mora*, 2003-NMCA-072, ¶ 18, 133 N.M. 746, 69 P.3d 256 (internal quotation marks and citation omitted). In analyzing whether there is "sufficient indicia of distinctness," we consider several factors:

> (1) temporal proximity of penetrations (the greater the interval between acts the greater the likelihood of separate offenses); (2) location of the victim during each penetration (movement or repositioning of the victim between penetrations tends to show separate offenses); (3) existence of an intervening event; (4) sequencing of penetrations . . . ; [and] (5) [the] defendant's intent as evidenced by his conduct and utterances[.]

*Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624; *State v. Pisio*, 1994-NMCA-152, ¶ 33, 119 N.M. 252, 889 P.2d 860 (stating that *Herron* "provide[s] the proper basis for whether conduct in sex-crime cases is unitary and should be understood as supplementing *Swafford*'s double jeopardy analysis on such facts). When reviewing the facts of a case to determine if each act is distinct from the others,

13

"we must indulge 'in all presumption in favor of the verdict.' " *State v. McClendon*, 2001-NMSC-023, ¶ 5, 130 N.M. 551, 28 P.3d 1092 (quoting *Herron*, 1991-NMSC-012, ¶ 20).

{23}     Using these factors as a guide, Defendant's encounters with E.M. throughout the night have sufficient indicia of separateness for two convictions and are therefore not unitary.  At some point, Defendant stopped "humping" E.M. and moved to a different room before resuming his contact with her.  The acts were separated by enough time for Defendant to go to his bedroom, Martinez to fall asleep, and Defendant to come back into the living room and lay down on the floor with E.M.  Additionally, from the evidence presented at trial, there was an additional separation between acts that could be inferred:  that when Martinez left to get help, Defendant got up from the floor where E.M. was, locked Martinez out of the house, and turned off the lights before resuming his contact with E.M.  The acts were also separated by the existence of intervening events, specifically Martinez's attempts to prevent Defendant's contact with E.M. by kicking and yelling at Defendant. Although Defendant's illegal conduct occurred within the confined space of his living room, it was far from constant, and the events spanned several hours.  All of this evidence was presented during trial and supports a conclusion that Defendant engaged in several separate acts, at least one of which involved penetration, rather than a single, unitary act directed against E.M.

{24} Defendant contends that "[t]here is no evidence to establish that these two acts [(CSC and CSP)] did not occur simultaneously." Even if Defendant's conduct was unitary, separate convictions for CSC and CSP do not violate double jeopardy because each charge requires proof of an element that the other does not. *Cf. State v. Trevino*, 1993-NMSC-067, ¶ 6, 116 N.M. 528, 865 P.2d 1172 (holding that the Legislature intended the crimes of CSCM and CDM be separately punishable crimes and reasoning that CSCM and CDM each require proof of facts not required to prove the other offense). The CSC conviction did not require that the State prove penetration to any extent, whereas CSP did. *Compare* § 30-9-12(C)(1) and (D) *with* § 30-9-11(F). CSC and CSP thus contain distinct elements, and the State offered evidence of Defendant's conduct that would satisfy each element. The evidence at trial indicates that Defendant humped E.M., while she had on no bottom clothing, on two distinct occasions. Medical evidence indicates penetration occurred. The jury need not have determined during which encounter penetration occurred to conclude that CSP occurred. The remaining encounter, which was not the basis for the CSP conviction, remains and is sufficient to stand as the basis for the CSC conviction.

{25} Having determined Defendant's conduct was not unitary, we need not reach the second step in the *Swafford* analysis, and we conclude that there was no double jeopardy violation. 1991-NMSC-043, ¶ 28 (stating that a finding that the defendant's conduct was not unitary ends the inquiry); *Swick*, 2012-NMSC-018, ¶ 11. We therefore affirm Defendant's conviction.

{26} **IT IS SO ORDERED.**

15

 

          _____

          **RODERICK T. KENNEDY,  Judge**

**WE CONCUR:**

_____

**JAMES J. WECHSLER, Judge**

_____

**J. MILES HANISEE, Judge**