NOTICE
Decision filed 10/08/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170089-U

NO. 5-17-0089

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 16-CF-81 |
| | ) | |
| STEVEN F. PLOWMAN, | ) | Honorable |
| | ) | Robert M. Hopkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Overstreet and Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirmed defendant's conviction for possession of methamphetamine where (1) the circuit court failed to comply with Illinois Supreme Court Rule 431(b), but the error did not amount to plain error; (2) the admission of other-crimes evidence did not amount to plain error or ineffective assistance of counsel; and (3) the court did not err by refusing to instruct the jury on possession as a voluntary act.

¶ 2    Following a jury trial, defendant, Steven F. Plowman, was found guilty of unlawful possession of less than five grams of methamphetamine, a Class 3 felony (720 ILCS 646/60(b)(1) (West 2014)), and sentenced by the circuit court of Lawrence County

1

to six years' imprisonment.[1] Defendant appeals, arguing that he was denied a fair trial where the court (1) failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*, (2) improperly admitted other-crimes evidence, and (3) refused to instruct the jury on possession as a voluntary act (see Illinois Pattern Jury Instructions, Criminal, No. 4.15 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 4.15)). For the following reasons, we affirm.

¶ 3                                   I. Background

¶ 4     On July 1, 2016, the Lawrence County Sheriff's Department executed a search warrant at a residence located at 6437 Castle Road in Lawrenceville, Illinois. After entering the residence, law enforcement officers located and detained six individuals: defendant; two of defendant's relatives, Luella and Shirley Plowman; defendant's friend, Phyllis Riker (n/k/a Phyllis Morgan), who lived at the residence; Riker's son, Chad Morgan, who the search warrant identified as the owner of the residence; and Morgan's girlfriend, April Cox, who lived with Morgan at the residence. During the search, officers recovered multiple drug-related items from the north bedroom and living room area of the residence, including several items of drug paraphernalia containing methamphetamine residue. Following the search, defendant, Morgan and Cox were arrested and transported to the Lawrence County jail.

---

[1]Defendant was sentenced pursuant to 720 ILCS 646/100(a) (West 2014) ("Any person convicted of a second or subsequent offense under this Act may be sentenced to imprisonment for a term up to twice the maximum term otherwise authorized, fined an amount up to twice that otherwise authorized, or both.").

¶ 5    On July 6, 2016, the State charged defendant by information with one count of unlawful possession of methamphetamine, alleging that defendant knowingly possessed less than five grams of methamphetamine or a substance containing methamphetamine on July 1, 2016. Defendant waived his right to a preliminary hearing, entered a plea of not guilty and elected to proceed to a jury trial.

¶ 6    Prior to trial, the State filed a motion *in limine* to exclude Riker's "inadmissible hearsay" testimony regarding Cox's purported statements that claimed ownership of all of the methamphetamine found at the residence. Defendant also filed a motion *in limine* to exclude evidence of his "prior criminal convictions and other alleged 'bad acts' " for any purpose at trial, including impeachment. Defendant's motion did not specifically identify the prior criminal convictions and other alleged bad acts or pending charges he sought to exclude.

¶ 7    On February 6, 2017, the case proceeded to a two-day jury trial. Before *voir dire*, the circuit court addressed the motions *in limine*. The court reserved ruling on the State's motion, as the defense planned to call Cox as a witness. With regard to defendant's motion, the court ruled that defendant's prior convictions for "Possession of Anhydrous Ammonia and Meth Manufacturing" would be admitted for the limited purpose of impeaching defendant's credibility if he testified at trial.

¶ 8    During *voir dire*, the circuit court questioned potential jurors in two panels of 14. In questioning the first panel, the court made the following statements regarding the *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)) set forth in Supreme Court Rule 431(b):

"So I'm going to have to ask a series of four questions, and these questions have to do with the burden of proof and aspects of that. And so I will ask this question, and I'll take them one at a time. And as I ask that question, then I'll ask everybody that same question, so listen very carefully. The law is that a defendant is presumed innocent of the charge against him or her. If you are—serve as a juror on this case, you will be required to follow that law. The principle is that a defendant is presumed innocent of the charge against him or her unless and until the charge has been proven against [d]efendant beyond a reasonable doubt."

The court then individually asked each potential juror if they understood that principle and if they could follow that principle. After eliciting responses from each potential juror, the court stated the "next principle is that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt." The court, again, individually asked each potential juror if they understood that principle and if they could follow it, and each potential juror responded in the affirmative. In addressing the third principle, the court stated that a "defendant is not required to offer any evidence on his or her own behalf." Each potential juror again affirmed that they both understood and could follow the third principle. In addressing the fourth and final principle, the court stated "that the defendant's failure to testify cannot be held against him or her." The court, again, asked, and each individual juror affirmed, that they both understood and could follow the fourth principle. Defense counsel did not object to the admonishments given to the first panel. The parties were provided an opportunity to question the first panel of potential jurors before proceeding to the strike conference.

¶ 9    During the strike conference, six potential jurors were stricken from the first panel and, following a brief recess, the circuit court asked the circuit clerk to call a second

4

panel of 14 potential jurors. In addressing the second panel, the court explained the nature of the charge against defendant but stated:

> "The fact that a criminal information has been filed against the defendant does not mean the defendant is guilty. The State has the burden of proving the charge against the defendant beyond a reasonable doubt. If you were called on to decide this case, you must do so on the basis of the law and the evidence in this case. Whatever may have happened in some other case you heard about or read about must have no effect upon your consideration of this case. I will ask a series of questions. As I indicated, if your answer is 'yes', please raise your hand. If your answer is 'no', leave it down. If you can't understand what I'm saying, need it rephrased or somehow re-asked, raise your hand and I'll inquire."

The court proceeded to inquire whether any potential juror in the second panel knew defendant or any of the witnesses or attorneys involved in the case.

¶ 10 Next, the State questioned the second panel of potential jurors. The State explained its burden of proof, and then individually asked each potential juror if they would have a problem signing a guilty verdict if the charges were proven beyond a reasonable doubt. Each potential juror responded, "No." The circuit court, in an attempt to comply with Supreme Court Rule 431(b), said to the second panel:

> "I will ask about certain principles. I believe the state's [attorney has] already covered one, and that is that before a defendant can be convicted, the State must prove the defendant guilty beyond a reasonable doubt. I believe you've all been inquired as to that. I will ask about the other three, though. One of the principles of our constitution and which is applied in cases of the State of Illinois of a criminal nature is that the defendant is presumed innocent of the charge against him or her. So the burden of proof is on the State. One [*sic*] again, the principle is that the defendant is presumed innocent of the charge against him or her."

The court proceeded to ask the first potential juror if he understood that principle and if he could apply that principle if called to serve on the jury. The first potential juror responded in the affirmative to both questions. The court proceeded in a different manner

5

in questioning the remainder of the second panel. Specifically, the court called the name of each potential juror, and then individually asked each juror if they had the "[s]ame answers?" Each potential juror first responded affirmatively to their name and then affirmed that they had the same answers as the first potential juror.

¶ 11    In admonishing the second panel of the other two principles—a defendant is not required to offer any evidence on his or her own behalf and a defendant's failure to testify cannot be held against him or her—the circuit court reiterated that the jury would be required to find defendant not guilty if the State rested without meeting its burden of proving defendant guilty beyond a reasonable doubt, regardless of whether defendant decided to present evidence or testify on his own behalf. After reading each principle aloud, the court again asked the first potential juror if he understood that principle and if he could apply it if selected. The first potential juror responded in the affirmative to both questions. In questioning the remainder of the second panel, the court called each potential juror's name and elicited an affirmative response. Defense counsel did not object to the admonishments given to the second panel of potential jurors. After a jury was selected and sworn, the following evidence was presented at defendant's trial.

¶ 12    Nicholas Earnst, a former Lawrence County sheriff's deputy involved in the execution of the search warrant on July 1, 2016, testified to the following details. At approximately 9:30 p.m. on that date, Earnst arrived at the residence in Lawrenceville with four other officers: two Lawrence County deputies, Danny Ash and Byron Middlecoat; a Bridgeport police officer, Jordan Feutz; and a Sumner police officer, J.D. Decker. Ash and Feutz remained stationed outside to ensure that no one fled the

6

residence, while Earnst, Middlecoat and Decker knocked on the front door and announced their presence. When no one answered after approximately 10 seconds, Decker used a ram tool to force entry into the residence.

¶ 13   The officers entered the residence and immediately located defendant, Riker, Luella and Shirley in the living room area. While Earnst supervised the four individuals in the living room, Middlecoat and Decker located Morgan and Cox in the north bedroom. After Morgan and Cox were handcuffed and brought into the living room, Earnst advised the six individuals of their *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Decker then supervised the six individuals while Earnst, Middlecoat and Feutz began searching the residence.

¶ 14   While searching the north bedroom, Earnst and Middlecoat found digital scales, coffee filters, and multiple clear, glass pipes covered with white residue. Meanwhile, Feutz discovered two bags, one green and one red, sitting on the living room floor, which defendant claimed belonged to him. Earnst returned to the living room after learning that Feutz found a digital scale in the green bag, and a clear, glass pipe and plastic baggie in the red bag. In examining these items, Earnst noted that the pipe had been used because the inside was covered in residue. Based on his past experience, Earnst believed the pipe was a "methamphetamine pipe." Earnst identified the clear, glass pipe, contained in the bag, marked as State's Exhibit No. 1, as the same pipe Feutz found in the red bag.

¶ 15   Earnst testified that he searched defendant's person before questioning defendant about the items recovered from his bags. During the search of defendant's person, Earnst found a purple pipe covered with a burnt, black residue, along with a baggie of a green

7

leafy substance resembling cannabis, in defendant's front, right pocket. Defendant immediately admitted ownership of the items recovered from his pocket. When Earnst questioned defendant about the items discovered in his bags, defendant admitted ownership of the digital scale found in the green bag but initially denied ownership of the clear, glass pipe and plastic baggie found in the red bag. When Earnst asked defendant "if he was to be urine tested would he test positive for methamphetamine," defendant responded in the affirmative. Earnst then again asked defendant, who was crying, sweating and shaking, if the pipe and baggie found in the red bag belonged to him and defendant "advised the items were his." Defense counsel did not object to Earnst's testimony regarding the search of defendant's person and the statements defendant made when questioned.

¶ 16    Defendant, Cox and Morgan were arrested and transported to the Lawrence County jail. Earnst then collected the items found in the north bedroom. Earnst put the items in separate evidence bags, sealed each individual bag and then placed the bags in his locked squad car. He went back inside the residence and collected the items found in the living room. He put the items in separate bags, sealed each individual bag and then placed the bags with the other bags in his locked car.

¶ 17    After clearing the residence, Earnst drove to the Lawrence County jail where he filled out charges on defendant, Cox and Morgan. Earnst next filled out two evidence inventory receipts for the items collected during the search and placed the items in his assigned locker in the evidence room located in the basement of the Lawrence County

Courthouse. The items remained in his evidence locker until Feutz transported the items to the forensic lab on August 24, 2016.

¶ 18    Earnst identified State's Exhibit No. 2 as the evidence inventory receipt listing the items recovered from the north bedroom on July 1, 2016. Next, Earnst identified State's Exhibit No. 3 as the evidence inventory receipt listing the items recovered from the defendant's person and the defendant's bags, on July 1, 2016. State's Exhibit No. 3 listed the following items: one clear, glass pipe; one clear, plastic baggie with white residue; one scale; one baggie of a green leafy substance, weighing approximately six grams; and one purple pipe with burnt, black residue. The circuit court admitted both exhibits over defendant's objection.

¶ 19    On cross-examination, defense counsel specifically questioned Earnst about defendant's responses to Earnst's questions during the search:

> "Q. You said you ask—asked [defendant] some questions. He—he admitted that apparent cannabis was his; is that right?
> A. Cannabis and pipe. Yes.
> Q. And you said he admitted to you that the scales were his; is that right?
> A. That is correct.
> Q. But he told you that the pipe, the glass pipe, was not his; is that correct?
> A. That is correct."

¶ 20    Next, Middlecoat and Decker both testified regarding their involvement in the execution of the search warrant. Their respective testimonies largely corroborated Earnst's testimony. Middlecoat testified that the officers "banged on the door three times" before gaining entry to the residence, and that, shortly after gaining entry, he entered the north bedroom and located Morgan and Cox. Middlecoat recalled that Morgan and Cox were both handcuffed and patted down before joining the other

9

individuals in the living room area. Middlecoat observed multiple items of drug paraphernalia commonly associated with the use of methamphetamine in the north bedroom. Middlecoat explained that Earnst was responsible for collecting the items recovered during the search. Decker testified that he remained in the living room area while the other officers searched the residence.

¶ 21 Feutz then testified regarding his involvement in the execution of the search warrant. Feutz initially guarded the perimeter to ensure no one fled when the other officers entered the residence. When Feutz entered the residence, he observed six individuals, including defendant, detained in the living room area. While searching the living room area of the residence, he discovered a red bag and a green bag sitting on the floor. When Officer Feutz asked defendant if the bags were his, defendant responded in the affirmative. Officer Feutz then searched the green bag and discovered various items, including a digital scale. In the bottom of the red bag, he discovered a pipe and "a little, clear, cut bag." Feutz observed that the pipe contained a residue, which he believed to be methamphetamine based on his experience. As Feutz pulled the pipe from the bag, defendant became physically upset and stated that the pipe did not belong to him. Feutz notified Earnst of the items he found in the bags and Earnst collected the items. Feutz then transported defendant to the jail.

¶ 22 On August 24, 2016, Feutz received certain items recovered during the search, including the pipe, from Earnst for transport to the forensic lab, and Feutz delivered the items to the lab the following day. Feutz identified State's Exhibit No. 1 as the pipe he found in defendant's red bag.

¶ 23   Marla Spangler, a forensic chemist employed by the Illinois State Police Crime Lab, testified to the following details. Spangler's job duties primarily consist of analyzing evidence for the presence of controlled substances. On August 25, 2016, she received an evidence bag, along with a corresponding evidence inventory receipt, from the Lawrence County Sheriff's Department. The receipt described the evidence contained in the evidence bag as a clear, plastic bag and a clear, glass pipe. While the receipt listed the agent's case number, Spangler added a separate laboratory case number and signed the receipt. Spangler identified the glass pipe contained in the bag, marked as State's Exhibit No. 1, as the same glass pipe she received on August 25, 2016. After receiving the evidence on August 25, 2016, she placed the evidence in "the vault" but retrieved it later that day to perform her analysis.

¶ 24   Spangler described the procedure she followed in testing the items as follows. She first cut through the seal at the bottom of the bag to gain access to the items. She next conducted her analysis of the residue found on the evidentiary items, which consisted of a preliminary color test and a confirmation test using a gas chromatograph mass spectrometer. The results from these tests led Spangler to conclude that the glass pipe contained methamphetamine residue. Spangler then resealed and initialed the evidence bag before placing it back in the vault. The evidence bag was picked up on January 25, 2017. Spangler also generated a report detailing her findings. Spangler identified the report, marked as State's Exhibit No. 5, as the same report she generated in her analysis of the glass pipe. State's Exhibit No. 1 was then admitted into evidence without

objection, and State's Exhibit No. 5 was admitted into evidence over defendant's objection.

¶ 25    On cross-examination, Spangler explained that the pipe was originally covered in a white, cloudy residue. However, she "did a menthol rinse of the pipe" to test the residue, which also leaves a white, smokey residue. Spangler did not perform any DNA or fingerprint analyses on the pipe, although the lab has the ability to perform such analysis.

¶ 26    After the State rested, defendant moved for a directed verdict. The circuit court denied the motion, finding there was sufficient evidence for the case to go to the jury.

¶ 27    Cox then testified to the following details on defendant's behalf. At the time of trial, Cox was incarcerated in the Lawrence County jail for charges stemming from the search warrant that was executed on July 1, 2016. While Cox recognized she had the right not to testify, she wanted to testify because she was "going to tell the truth." When officers entered the residence to execute the search warrant, she was asleep in the north bedroom. Cox claimed that all of the methamphetamine-related items officers found at the residence belonged to her, including the items found in the red bag on the living room floor. Cox explained that she had been using the pipe and baggie to get high in the living room of the residence earlier that day but threw the items inside of the red bag when someone knocked on the door and startled her. She hid the items in the red bag because she did not want anyone to know she was "using" at that time and it was "the only place" she could find to hide the items. Cox did not know who owned the red bag at that time and forgot about the items. When asked to identify the items marked as the State's

12

Exhibit No. 1, Cox described a "pipe and a container." Cox claimed that the pipe was the same pipe she put in the red bag.

¶ 28   On cross-examination, Cox identified a written statement, marked as State's Exhibit No. 7, as the statement that she prepared when she "got out of jail the first time." The statement was written on a voluntary statement form Cox obtained from the jail after she pled guilty in her case. Cox prepared the statement at her friend's house but claimed no one was present when she prepared the statement. She then gave the statement to Riker, who returned the statement to police. Cox had known Riker for three years and had dated her son, Morgan. Riker occasionally brought Cox money at the jail.

¶ 29   The State then questioned Cox about her claim that she had placed the pipe in the red bag earlier that day:

> "Q.  So someone knocks at the door, and you don't take this pipe into the bedroom and put it with the other items? You just throw it on top of the bag?
> A.  No. I was asleep. I did that earlier that day.
> Q. Did what earlier that day?
> A. Put that in the bag.
> Q. At what point did you put it in the bag.
> A. In the morning.
> Q. About what time?
> A. About 11.
> Q. And that was on what date?
> A.  It would be the last day of June.
> Q. So the day before?
> A. No. The 1st. Sorry. 1st. Yes. That morning.
> Q. Now, do you recognize the container that was in that bag?
> A. Yes, I do.
> Q. And where did you see that?
> A. That was in the bag.
> Q. That was in the bag, also?
> A. Uh-huh.

Q. So earlier you testified that the—you placed the pipe and a baggy in it, but now also the container?

A. Yes. And the container."

The State then returned to questioning Cox about the written statement she provided to police. Cox admitted that she had been released from jail after pleading guilty to unlawful possession of methamphetamine, but she was taken back into custody after failing two drug tests in violation of a court order. While Cox claimed ownership of specific items officers recovered from the north bedroom in her statement, she acknowledged that her statement made no mention of the pipe and baggie found in the red bag. Cox claimed that she remembered putting the pipe and baggie in the red bag but did not mention those items in her statement because she was "charged with just the pipes in the bedroom."

¶ 30    State's Exhibit No. 7 was admitted into evidence without objection. Cox's written statement contained her signature and listed her address as "6437 Castle Road." Riker signed Cox's written statement as a witness before a notary at the police department on August 12, 2016.

¶ 31    Riker testified to the following details on defendant's behalf. Riker became acquainted with defendant years ago when he dated her daughter. When the relationship between defendant and her daughter ended, Riker and defendant maintained a friendship and the two had become good friends over the years. Riker lived by herself at the residence but had temporarily moved defendant's "mom and sister in with [her] because their house burnt."

¶ 32    Riker testified that, on the morning of July 1, 2016, she drove her vehicle to defendant's house on Dubois Street in Lawrenceville. Defendant had been sleeping in his

14

van because his house had been damaged in a fire. When she arrived, defendant was "cleaning up the place" so he could put a trailer on the property. She drove defendant, who was unable to drive, to the consignment store where he had "stuff" he was trying to sell. At the consignment store, Riker assisted defendant in packing various items into a "camouflage backpack" and a red drawstring bag. They left the consignment store with the two bags, and Riker drove defendant back to his house on Dubois Street. Riker denied seeing the pipe and baggie in the bags and claimed she would not have allowed the bags in her car if she had seen such items. Riker dropped defendant off at his house so he could finish cleaning but planned on picking him up later that evening so he could shower and "get something to eat" at her house. Defendant left the two bags on the back seat floorboard of Riker's vehicle "because he wanted to go through them when he got to [her] house later on that night."

¶ 33 Riker returned home before noon and took the bags inside the house, where Morgan, Cox and one of Riker's friends were talking. After placing both bags against the far wall in her front room, Riker went to her bedroom to change clothes because she was tired, and she knew she had to "pick [defendant] up about 10:00 or whenever it was that [she] had to go pick him up." Riker's daughter later came to the house and borrowed Riker's car. When defendant subsequently called Riker "so he could talk to his mom," she advised that she did not have a car to pick him up. At defendant's suggestion, Riker had a friend drive her to defendant's residence so she could drive defendant back to her house in his van.

15

¶ 34 When they returned to her house, she fixed defendant a sandwich while he conversed with Luella and Shirley in the living room area. Riker noticed that Morgan and Cox were asleep in Morgan's bedroom, so she turned off the light and shut the bedroom door before joining defendant, Luella and Shirley in the living room area. While sitting in the living room, Riker observed "a tall guy" walk into her house "without knocking" and walk right back outside. She then heard a knock, and someone say, "Lawrence County Police Department." When Riker opened the door, an officer directed her to get on the floor and she complied.

¶ 35 On cross-examination, Riker acknowledged that there were a few items in the bottom of the red bag before she assisted defendant in packing additional items into the bag at the consignment store. She admitted that she did not look through those items and that it was possible the pipe and baggie could have been in the bottom of the red bag. Riker recalled that, when she returned home, her daughter, Morgan and Cox were at her house with a man and woman. Riker also recalled that, after she used the restroom and changed clothes in her bedroom, the woman gave her a ride to defendant's residence to pick up the van. Riker returned home with defendant around 9 p.m. or 10 p.m. that evening. Riker believed no one had touched the bags because they were exactly where she had left them but acknowledged that someone could have "touched them when [she] was gone."

¶ 36 After the defense rested, the State called Spangler as a rebuttal witness. When asked to identify each item contained in the bag marked as State's Exhibit No. 1, Spangler identified two items—"a glass pipe" and "a little, glass vial with a little bit of

16

liquid." Spangler clarified that the glass vial was not in the bag with the glass pipe when she received the evidence bag. Spangler explained that she used the glass vial in her analysis and had placed the glass vial in the bag with the glass pipe following her analysis. Spangler explained that the glass vial contained the unused portion of the menthol rinse she had applied to the pipe, and that she had labeled the vial with the case number before placing it back in the bag.

¶ 37    After both parties rested, the defense renewed the motion for a directed verdict. The circuit court denied the motion, finding that the case depended on the credibility of Cox and Riker, which was a question for the jury.

¶ 38    At the jury instruction conference, defendant requested the circuit court instruct the jury pursuant to IPI Criminal 4th No. 4.15, which defines when possession is a voluntary act. Defendant's proposed instruction provided that "[p]ossession is a voluntary act if the person knowingly procured or received the thing possessed, or was aware of his control of thing for a sufficient time to have been able to terminate his possession." The State objected, arguing that defendant's proposed instruction was irrelevant "with possession as a voluntary act" and "State's IPI 4.16" (see Illinois Pattern Jury Instructions, Criminal, No. 4.16 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 4.16)) sufficiently covered the definition of possession. IPI Criminal 4th No. 4.16 provided that "[p]ossession may be actual or constructive" and that constructive possession occurs when the person lacks actual possession, which occurs when a person has immediate and exclusive control over a thing, but "has both the power and the intention to exercise control over a thing either directly or through another person." Defendant argued the jury

17

could conclude from the evidence that he was unaware of the presence of the items found in his bag and, thus, his proposed instruction would clarify that he had "to have either knowingly procured or received it or have been at least aware that he was in control of it." The court refused defendant's proposed instruction, finding the instruction confusing. The court also found that the jury had "enough common sense to understand that if he didn't put it in there, it's not his."

¶ 39    The State's closing argument highlighted the evidence showing that defendant admitted ownership of the red bag and the glass pipe found therein. The State also noted "a mountain of problems with [Cox's] testimony" and again reiterated that defendant "admitted the pipe was his." In turn, the defense highlighted the evidence showing that defendant was not nervous at the outset of the search and readily admitted that the red bag belonged to him. The defense argued that defendant was surprised by the discovery of the pipe, as evidenced by the change in his demeanor, and would not have admitted ownership of the bags had he known the pipe was inside.

¶ 40    Following deliberation, the jury found defendant guilty of unlawful possession of methamphetamine. Defendant filed a motion for new trial, alleging, *inter alia*, that the circuit court erred by denying his motion *in limine* and refusing his tendered jury instruction, IPI Criminal 4th No. 4.15. The court denied the motion following a hearing. The court subsequently sentenced defendant to six years' imprisonment. Defendant filed a timely notice of appeal.

18

¶ 41                                    II. Analysis

¶ 42                                  A. Rule 431(b)

¶ 43    Defendant first contends that the circuit court committed reversible error by failing

to strictly comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). Defendant

acknowledges that he forfeited review of this issue by failing to object during *voir dire*

and failing to include the issue in his posttrial motion. See *People v. Belknap*, 2014 IL

117094, ¶ 66 ("To preserve an alleged error for review, a defendant must both make an

objection at trial and include the issue in a posttrial motion."). Nevertheless, he asserts

that this court may review the issue under the plain-error doctrine because the court

clearly erred and the evidence was closely balanced.

¶ 44    The plain-error doctrine provides a "narrow and limited exception" to the

forfeiture rules. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The plain-error doctrine

permits review of a forfeited claim when a clear or obvious error occurred and either

(1) "the evidence is so closely balanced that the error alone threatened to tip the scales of

justice against the defendant, regardless of the seriousness of the error," or (2) "a clear or

obvious error occurred and that error is so serious that it affected the fairness of the

defendant's trial and challenged the integrity of the judicial process, regardless of the

closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing

*People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). A defendant bears the burden of

establishing plain-error review is proper. *Hillier*, 237 Ill. 2d at 545. "The ultimate

question of whether a forfeited claim is reviewable as plain error is a question of law that

is reviewed *de novo*." *People v. Johnson*, 238 Ill. 2d 478, 485 (2010).

¶ 45    The first analytical step under either prong of the plain-error doctrine is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. Defendant specifically argues, and the State concedes, that the circuit court erred by failing to strictly comply with the requirements set forth in Supreme Court Rule 431(b) when it admonished the second panel of jurors of during *voir dire*. Supreme Court Rule 431(b) requires that the court ask every prospective juror whether he or she "understands and accepts" the following four principles:

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her ***." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

A court must provide each prospective juror with an opportunity to respond to questions concerning the four principles to "ensure that each prospective juror both understands and accepts each of the four principles." *People v. Montgomery*, 2018 IL App (2d) 160541, ¶ 25 (citing *Belknap*, 2014 IL 117094, ¶¶ 44-46; *People v. Wilmington*, 2013 IL 112938, ¶ 32; *People v. Thompson*, 238 Ill. 2d 598, 607 (2010)).

¶ 46    Here, the circuit court did not question the second panel of prospective jurors on the second principle—whether they understood and accepted that the State was required to prove defendant guilty beyond a reasonable doubt. Because Supreme Court Rule 431(b) requires a court to question jurors on each of the enumerated principles, the court did not comply with the rule. Based on the State's concession, and our review of the

20

record, we hold that the court erred by failing to comply with Supreme Court Rule 431(b).

¶ 47    We next must determine whether the error rises to the level of plain error. Defendant argues that the issue is reviewable under the first prong of the plain-error doctrine. When a defendant claims first-prong plain error, "a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. In considering whether the trial evidence was closely balanced, "a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. "A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*

¶ 48    Here, defendant was charged under section 60(a) of the Methamphetamine Control and Community Protection Act, which provides that "[i]t is unlawful knowingly to possess methamphetamine or a substance containing methamphetamine." 720 ILCS 646/60(a) (West 2014). Accordingly, to sustain a conviction on the charge, the State was required to prove that defendant knowingly possessed methamphetamine. "The element of knowledge is rarely susceptible to direct proof and is usually established by circumstantial evidence." *People v. Bui*, 381 Ill. App. 3d 397, 419 (2008). Knowledge may be established by evidence of acts, statements, or conduct of the defendant, as well as the surrounding circumstances, which supports the inference that he knew of the existence and location of the illegal substance. *Id.* Possession may be actual or

21

constructive. *People v. Givens*, 237 Ill. 2d 311, 335 (2010). Actual possession is shown when a defendant demonstrates "some form of dominion over the unlawful substance, such as trying to conceal it or throw it away." *People v. Morrison*, 178 Ill. App. 3d 76, 90 (1988). "Constructive possession exists where an intent and capability to maintain control and dominion over the substance exists." *People v. Neylon*, 327 Ill. App. 3d 300, 306 (2002). "The evidence establishing constructive possession is often wholly circumstantial." *People v. Newman*, 211 Ill. App. 3d 1087, 1093 (1991).

¶ 49 According to defendant, the evidence "concerning the disputed issue of who possessed the pipe containing the methamphetamine residue" was closely balanced because both parties presented evidence in support of their respective theories and the case rested on a "contest of credibility." Defendant's theory was that the pipe found in his red bag never belonged to him and that Cox had, unbeknownst to him,[2] placed the pipe in his red bag at some point after the bag was transported to the residence. According to defendant, his surprised reaction to the discovery of the glass pipe, coupled with Cox's testimony, demonstrated he was unaware that the pipe was in his bag.

¶ 50 At trial, the State presented the testimony of four officers involved in the search and a forensic chemist, along with numerous exhibits. The evidence showed, and defendant does not dispute, that officers found a glass pipe containing a residue, which later tested positive for methamphetamine, inside of defendant's red bag while searching the residence. Defendant admitted ownership of the red bag before it was searched, and

---

[2]Defendant asserts in his reply brief that the pipe was placed in his bag "against his will." We find no support for that assertion in the record. Instead, during the instruction conference, defense counsel only asserted that "[defendant] may not have been aware of the presence of what was in his bag."

the pipe was discovered by Feutz under various items of clothing. A digital scale was also discovered inside of defendant's green bag. Feutz showed the items to Earnst, who then searched defendant's person and questioned defendant. Earnst testified that defendant admitted ownership of the digital scale and that, although defendant initially denied ownership of the pipe found in his red bag, he eventually admitted ownership of the pipe as well. Specifically, defendant admitted that the pipe belonged to him after acknowledging that, if he were drug tested, his urine would test positive for methamphetamine.

¶ 51    In arguing that the evidence is closely balanced, defendant does not dispute his own admission. Defendant, instead, focuses on the evidence he presented, which he claims supported his theory of the case and undermined Earnst's testimony regarding his admission. Specifically, the officers' testimonies showing that he readily admitted ownership of the red bag and that he appeared to be surprised by the discovery of the pipe in his bag. Defendant also focuses on the evidence he presented at trial, specifically the testimonies of Riker and Cox. While Riker testified that she did not observe the pipe and plastic baggie inside of the red bag when she assisted defendant in packing both bags that morning, she admitted that there were various items in the bottom of the red bag before they began packing and it was possible the pipe and plastic baggie could have been hidden under those items. Riker testified that she placed both bags on the living room floor when she returned home some time before noon, and that several individuals, including Cox, had been in and out of her residence throughout the day. Riker claimed that she did not touch the bags again and that, although it was possible someone else

23

could have touched the bags throughout the day, she did not believe the bags had been disturbed. We note that Riker's testimony, assuming it was credible, regarding her belief that the bags had not been disturbed, could be viewed as unfavorable to defendant, given that his theory of the case was that Cox opened the bag and put the pipe inside earlier that day. Moreover, her testimony, at most, demonstrates that the bags were on the living room floor earlier that day, and that several individuals, including Cox, had been in and out of the residence throughout the day.

¶ 52 Defendant relies heavily on Cox's testimony that the pipe belonged to her, and that she had placed the pipe and baggie inside of the red bag earlier that day. Cox explained that she was using methamphetamine in the living room and, at approximately 11 a.m., someone startled her by knocking on the door. She immediately looked for a place to conceal the pipe and baggie because she did not want anyone to know she was "using." She claimed the red bag was the only place she could find to hide the pipe and baggie, so she threw the items into the bag and forgot about them.

¶ 53 In our view, however, Cox's version of events was implausible and lacked believability for several reasons. First, as the State points out, Cox also testified that she placed the glass vial in the red bag, which is directly contradicted by Spangler's credible testimony that the glass vial was used in her analysis of the pipe months later. Second, Cox's testimony that she hurriedly threw the pipe inside of the red bag appears to conflict with Feutz's testimony that he found the pipe under various items of clothing near the bottom of the bag. Third, Cox's testimony that she forgot about placing the pipe in the red bag is implausible, given that she was detained in the living room when the pipe was

24

found in defendant's bag. Moreover, while the trial evidence fails to clarify exactly when Cox remembered placing the items in the red bag, we find it noteworthy that she failed to claim ownership of the pipe and baggie in her August 12, 2016, written statement, in which she claimed ownership of other specific items found during the search. We also note that Riker signed the written statement as a witness; however, Cox testified that no one was present when she prepared the written statement. For these reasons, we find the trial evidence clearly demonstrated that Cox lacked credibility and, thus, her testimony pales in comparison to defendant's admission and the State's other evidence in the case.

¶ 54 Thus, based on the totality of the evidence and our qualitative, commonsense assessment of the evidence presented at trial, we find no basis to conclude that the evidence was closely balanced. Although defendant presented some evidence in support of his theory at trial, we find defendant's version of events improbable and unsupported by credible evidence, especially when viewed in light of his admission. We, therefore, find the evidence was not so closely balanced as to warrant plain-error review and honor his procedural forfeiture of the issue relating to the circuit court's failure to comply with Supreme Court Rule 431(b).

¶ 55                                  B. Propensity Evidence

¶ 56 Defendant next contends that the circuit court committed reversible error by admitting other-crimes evidence at his trial. Defendant specifically argues that the circuit court erred by allowing Earnst to testify that he found the purple pipe, along with the suspected cannabis, in defendant's front pocket and that defendant admitted his urine would test positive for methamphetamine. Defendant also argues that the court erred by

25

admitting the evidence receipt that listed the purple pipe and suspected cannabis as attributable to defendant (State's Exhibit No. 3). Defendant acknowledges that he also forfeited review of these claims either by failing to object to the introduction of the evidence at trial or by failing to include the issues in his posttrial motion, but he again argues that this court may review the unpreserved claims under either prong of the plain-error doctrine.

¶ 57    Because we have determined that the evidence in this case was not closely balanced, we will only consider whether the unpreserved claims are reviewable under the second prong of the plain-error doctrine. As noted, the second prong permits review of unpreserved claims when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *Piatkowski*, 225 Ill. 2d at 565 (citing *Herron*, 215 Ill. 2d at 186-87). "Although the erroneous admission of other-crimes evidence ordinarily calls for reversal, the evidence must have been a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different." *People v. Hall*, 194 Ill. 2d 305, 339 (2000). In other words, reversal is not warranted if it is unlikely that the error influenced the jury. *People v. Cortes*, 181 Ill. 2d 249, 285 (1998).

¶ 58    We begin by considering whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49. We first address defendant's argument that the circuit court erred by allowing Earnst's testimony regarding the purple pipe and the suspected cannabis and defendant's admission that his urine would test positive for methamphetamine. Evidence

26

of other crimes and offenses is generally inadmissible to show "the defendant's disposition or propensity to commit crime." *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Illinois Rule of Evidence 404(b) addresses evidence pertaining to "Other Crimes, Wrongs or Acts" and provides in relevant part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith ***. Such evidence may also be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011).

However, even if offered for a permissible purpose, other-crimes evidence should not be admitted if its prejudicial impact outweighs its probative value. *People v. Chapman*, 2012 IL 111896, ¶ 19.

¶ 59 Although the State offers no grounds justifying the admission of the challenged evidence, we cannot say that the admission of Earnst's testimony amounted to clear error. Courts have found that evidence of other crimes and offenses is admissible when such evidence is part of a continuing narrative of the events giving rise to the offense, the evidence is intertwined with the charged offense, or the evidence explains an aspect of the charge that would otherwise be implausible or inexplicable. *People v. Slater*, 393 Ill. App. 3d 977, 992-93 (2009). In addition, "evidence of the course of the investigation into a crime and the events leading up to an arrest are relevant when necessary and important to a full explanation of the State's case." *People v. Gonzalez*, 379 Ill. App. 3d 941, 950 (2008); see also *People v. Byrd*, 43 Ill. App. 3d 735, 742 (1976) ("Informing the triers of

fact of consequential steps in the investigation of a crime is normal procedure and is important to the full presentation of the State's case.").

¶ 60 Here, Earnst's testimony regarding the purple pipe and suspected cannabis found in defendant's front pocket explained the course of his investigation into the charged offense and the events leading up to defendant's arrest. The evidence demonstrated that Earnst executed a search warrant at a residence and, although defendant did not live at the residence, officers found several drug-related items, including a methamphetamine pipe, plastic baggie and digital scale, inside of defendant's red and green bags during the search. Earnst testified that he first examined the pipe, plastic baggie and digital scale found in defendant's bags but, before questioning defendant about these items, Earnst searched defendant's person and found a purple pipe and suspected cannabis in defendant's pocket. Earnst testified that he then questioned defendant about the items found in his pocket and, after defendant advised that both items belonged to him, Earnst questioned defendant about the items found in his bags during the search. Earnst testified that defendant initially denied ownership of the pipe and plastic baggie found in his red bag but admitted ownership of the digital scale found in his green bag. Earnst continued questioning defendant, who was crying, sweating and shaking, about the pipe and baggie found in his red bag and, after defendant admitted his urine would test positive for methamphetamine, defendant "advised the items were his." Because Earnst's testimony explained the circumstances leading to defendant's subsequent admission that the glass pipe did in fact belong to him, and, in the context of this case, arguably shows his knowledge of the pipe, permissible under Illinois Rule of Evidence 404(b) (eff. Jan. 1,

28

2011), we do not find it improper. Earnst's testimony also advised the jury of the consequential steps in his investigation. Thus, under these circumstances, we cannot say that that admission of Earnst's testimony amounted to a clear or obvious error.

¶ 61   In addition, we note that, not only did defense counsel fail to object to Earnst's testimony regarding the purple pipe and suspected cannabis, counsel revisited this specific testimony on cross-examination. Specifically, defense counsel attempted to discredit Earnst's testimony regarding defendant's admission that the pipe belonged to him by highlighting Earnst's testimony that defendant initially admitted ownership of the suspected cannabis and digital scale but denied ownership of the pipe found in his red bag. For this additional reason, we find no clear and obvious error occurred where defense counsel, in effect, acquiesced to the admission of Earnst's testimony regarding defendant's voluntary admissions that various drug-related items belonged to him. See *People v. Bush*, 214 Ill. 2d 318, 332-33 (2005) ("when a defendant procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, [he] cannot contest the admission on appeal."). This is especially true where defense counsel did not seek to bar this testimony before trial, defense counsel did not object at trial, and then defense counsel clearly relied upon this testimony as part of the defense's trial theory.

¶ 62   We next consider defendant's claim that State's Exhibit No. 3, the evidence inventory receipt listing the purple pipe and suspect cannabis as attributable to defendant, was improperly admitted at trial. At trial, Earnst identified the evidence inventory receipt he prepared regarding the items he discovered during the search that were attributable to

29

defendant as State's Exhibit No. 3. In addition to the glass pipe and plastic baggie found in defendant's red bag, the evidence receipt listed the purple pipe and suspected cannabis found in defendant's pocket as attributable to defendant. Defendant objected to the admission of the inventory receipt as impermissible hearsay, but he now contends that this receipt constituted improperly admitted other-crimes evidence. Thus, defendant has waived the right to object on the grounds he now asserts on appeal. See *People v. Berberena*, 265 Ill. App. 3d 1033, 1050 (1994) ("Because objections at trial on specific grounds waive all other grounds of objections, defendants have waived the right to object on the grounds they now assert on appeal.").

¶ 63    Even assuming, *arguendo*, that the admission of the evidence inventory receipt was error, this evidence was not a material factor in his conviction "such that, without the evidence, the verdict likely would have been different." *Hall*, 194 Ill. 2d at 339. This is especially true where the State's evidence showed that defendant admitted that both the red bag and the glass pipe found therein belonged to him. Thus, even if improperly admitted, we cannot say that the evidence inventory receipt was a material factor in defendant's conviction. For the foregoing reasons, we conclude that defendant has failed to show that the circuit court's admission of other-crimes evidence amounted to plain error under the second prong.

¶ 64    Defendant alternatively argues that defense counsel was ineffective in failing to object to the introduction of the other-crimes evidence at trial. A defendant has a constitutional right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *People v. Albanese*, 104 Ill. 2d 504, 525-26 (1984); see also

U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Counsel provides ineffective assistance where (1) counsel's decisions were objectively unreasonable and (2) a reasonable probability exists that but for counsel's deficient performance, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 687-89; *Albanese*, 104 Ill. 2d at 525-26. Given the analysis outlined above, we similarly conclude that there is no reasonable probability that the outcome of defendant's trial would have been different had the other-crimes evidence not been admitted. Thus, we reject defendant's claim that defense counsel was ineffective for failing to object. See *Hall*, 194 Ill. 2d at 340.

¶ 65　For similar reasons, we reject defendant's last argument that the cumulative effect of the other-crimes evidence denied him a fair trial. As discussed above, the circuit court did not err in admitting Earnst's testimony. Defendant waived review of his claim that the circuit court erred in admitting the evidence inventory receipt on the grounds that it constituted other-crimes evidence. Moreover, any arguable error that occurred in admitting any of the challenged evidence was harmless in light of the strong evidence against him in this case.

¶ 66　　　　　　　　　C. Jury Instruction

¶ 67　Lastly, defendant contends that the circuit court committed reversible error by refusing his tendered jury instruction regarding possession as a voluntary act. We initially note that, unlike his previous claims, defendant preserved this claim for review by tendering the instruction at trial and including the issue in his posttrial motion. See *Herron*, 215 Ill. 2d at 175 ("Generally, a defendant forfeits review of any putative jury

31

instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion.").

¶ 68 Defendant correctly notes that where, as here, the issue is preserved, " 'a defendant's claim of improper jury instructions is reviewed under a harmless-error analysis.' " *People v. Gonzalez*, 326 Ill. App. 3d 629, 636 (2001) (quoting *People v. Amaya*, 321 Ill. App. 3d 923, 929 (2001)). "[T]he test for harmless error in the context of an instructional error is whether the result at trial would have been different had the jury been properly instructed." *People v. Dennis*, 181 Ill. 2d 87, 95 (1998) (citing *People v. Johnson*, 146 Ill. 2d 109, 137 (1991)). Unlike a plain-error analysis, in a harmless-error analysis, the State bears the burden of persuasion and, thus, "must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *People v. Thurow*, 203 Ill. 2d 352, 363 (2003).

¶ 69 However, similar to a plain-error analysis, the first analytical step in a harmless-error analysis is to determine whether any error occurred. *Dennis*, 181 Ill. 2d at 95. Defendant, citing *People v. Larry*, 218 Ill. App. 3d 658 (1991), claims the circuit court erred by refusing to tender IPI Criminal 4th No. 4.15, which would have instructed the jury that "[p]ossession is a voluntary act if the person knowingly procured or received the thing possessed, or was aware of his control of the thing for a sufficient time to have been able to terminate his possession." IPI Criminal 4th No. 4.15. According to defendant, the jury should have received this instruction because it supported his theory of the case— that he "was not in possession of the glass pipe containing the methamphetamine residue, because he was unaware that the glass pipe was in his bag." Defendant further maintains

that, without his proposed instruction, the jury may have improperly convicted him based on the mere presence of the pipe in his bag.

¶ 70    In contrast, the State argues that the circuit court properly denied the instruction regarding voluntary possession. The State, citing *Bui*, 381 Ill. App. 3d 397, asserts that the instruction would have confused the issue before the jury, which was whether defendant "knowingly possessed" the methamphetamine. The State alternatively argues that any error in denying the instruction was harmless.

¶ 71    Jury "[i]nstructions convey the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations toward a proper verdict." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008) (citing *People v. Hudson*, 222 Ill. 2d 392, 399 (2006)); see also *Herron*, 215 Ill. 2d at 187 ("The function of jury instructions is to convey to the jury the law that applies to the evidence presented."). "There must be some evidence in the record to justify an instruction, and it is within the [circuit] court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *Mohr*, 228 Ill. 2d at 65. "Instructions which are not supported by either the evidence or the law should not be given." *Id*. A reviewing court is tasked with determining "whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *Id*.

¶ 72    Generally, the circuit court's refusal to give a tendered jury instruction is reviewed for an abuse of discretion. *People v. Monroe*, 366 Ill. App. 3d 1080, 1088 (2006). An abuse of discretion occurs where the ruling is "arbitrary, fanciful or unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v.*

33

*Laabs*, 2011 IL App (3d) 090913, ¶ 18. If, however, the issue on appeal requires a determination of whether the given instructions adequately conveyed the applicable law to the jury, our review is *de novo*. *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 119.

¶ 73    In *Larry*, the defendant appealed his conviction for unlawful use of a weapon by a felon, arguing, *inter alia*, that the circuit court erred by refusing to instruct the jury that possession is a voluntary act. 218 Ill. App. 3d at 660. The trial evidence showed that the defendant was stopped for a traffic violation while he was driving a friend's vehicle, and, during the stop, officers noticed the handle of a gun protruding from underneath the mat on the driver's side of the vehicle. *Id*. at 660. The defendant claimed that he did not know the gun was in the vehicle. *Id*. at 661. The defense tendered IPI Criminal 4th No. 4.15, but the circuit court refused to tender the instruction "on the ground that it would be 'confusing' to the jury." *Id*. at 665. On appeal, the First District concluded "that [the defendant] should not be denied the right to an instruction on voluntary possession merely because he denied knowledge of the gun altogether." *Id*. The First District held that it was reversible error for the circuit court to refuse the instruction on voluntary possession where, given the position of the gun under the mat, "the jury might legitimately have inferred that the defendant had been aware of the gun, but not for a sufficient time to enable him to terminate his possession." *Id*. at 665-66.

¶ 74    In *Bui*, the defendant appealed his convictions for possession of a controlled substance with intent to deliver, arguing, *inter alia*, that the circuit court abused its discretion by refusing to instruct the jury regarding possession as a voluntary act. 381 Ill. App. 3d at 400. The trial evidence showed that, during an inspection at a United Parcel

34

Service (UPS) location, officers searched a suspicious package and found a large dietary supplement container with narcotics hidden inside. *Id*. at 400-01. Officers then arranged a controlled delivery of the package, which was taken to a nail salon and later picked up by the defendant. *Id*. at 401-02. After the defendant returned home with the package, officers entered the residence with a search warrant and found the open package, along with the dietary supplement container holding the narcotics, on the floor of the defendant's bedroom. *Id*. at 402-03. The defense tendered IPI Criminal 4th No. 4.15, but the circuit court denied the instruction because the disputed issue at trial was whether the defendant had knowledge as to the contents of the package. *Id*. at 424.

¶ 75    On appeal, the First District determined that the disputed issue at trial was knowledge, not voluntary possession, where the defendant argued that he was not aware of the narcotics inside the package. *Id*. at 425. The First District concluded that the circuit court properly instructed the jury that the State was required to prove that the defendant "knowingly possessed" the narcotics with the intent to deliver, and that the jury could not have made this finding if it believed that the defendant was unaware of the narcotics inside of the package. *Id*. at 425-26. The First District, citing "the lack of evidence indicating that [the] defendant's possession was involuntary and the fact that the disputed issue at trial was knowledge," concluded that "the meaning of the requested instruction would have been unclear and its submission would have only served to confuse the jury." *Id*. at 426 (citing IPI Criminal 4th No. 4.15, Committee Comments, at 130 (noting that the instruction "should be given only if voluntariness is an issue"); *People v. Redmond*, 73 Ill. App. 3d 160 (1979)). Thus, the First District held that the circuit court properly

35

refused the instruction, while also noting that any error in refusing to instruct the jury was harmless where the evidence of the defendant's guilt was overwhelming. *Id.*

¶ 76 Here, as in *Bui*, the question before the jury was whether defendant knowingly possessed the methamphetamine pipe, not whether his possession was voluntary. Defendant acknowledges that, in order to sustain a conviction on the charge of methamphetamine possession, the State was required to prove that he *knowingly* possessed methamphetamine or substance containing methamphetamine. 720 ILCS 646/60(a) (West 2014). Similar to *Bui*, where the defendant focused on the element of knowledge at trial by arguing that he was not aware of the narcotics, defendant, here, has consistently maintained, both at trial and in his brief to this court on appeal, that he "was not in possession of the glass pipe containing the methamphetamine residue, because he was unaware that the glass pipe was in his bag." In support of this theory, the defense presented Cox's testimony that, unbeknownst to defendant, she placed the pipe inside of his bag earlier in the day. The State never argued to the jury that defendant should be subject to criminal liability based on the mere presence of the methamphetamine pipe in his bag, and defendant's assertion that the jury may have found him guilty on this basis is not supported by the record. Thus, in our view, the record clearly shows that the disputed issue at trial was whether defendant knowingly possessed the methamphetamine.

¶ 77 The record also shows that the jury instructions given by the circuit court, considered as a whole, fully and accurately conveyed the applicable law to the jury. In addition to instructing the jury on the burden of proof, presumption of innocence and the definitions of actual and constructive possession, the court instructed the jury that the

36

State was required to prove that defendant "knowingly possessed" methamphetamine. Defendant does not challenge the propriety of this instruction but maintains that the instruction regarding voluntary possession was necessary to explain to the jury the possibility that his possession "was involuntary, and consequently not knowing." However, if the jury believed defendant was unaware that the pipe was in his bag, it could not have found that he "knowingly possessed" methamphetamine. See *Bui*, 381 Ill. App. 3d at 425-26; see also *Redmond*, 73 Ill. App. 3d 160 (same instruction properly refused where the jury could not have found the defendant "knowingly possessed" the contraband if it had believed the defendant's testimony that he had not known about the drugs and there was no other evidence from which the jury could have found that the defendant became aware of the drugs but did not have sufficient time to terminate his possession). Under these circumstances, the instruction regarding voluntary possession was unnecessary and likely would have confused the jury.

¶ 78   Moreover, we find the present case distinguishable from *Larry*, where the circuit court found that a jury could have reasonably determined from the evidence that the defendant had been aware of the partially concealed gun. Here, unlike *Larry*, there was no evidence presented at defendant's trial from which the jury could have concluded that defendant became aware that the pipe was in his bag but, by then, lacked sufficient time to remove the pipe. Instead, the evidence showed that when officers searched the residence, the methamphetamine pipe was inside of defendant's bag, concealed from view. Defendant fails to identify any other evidence that would establish that he suddenly became aware of the pipe but lacked sufficient time to dispossess himself of the pipe.

Thus, the trial evidence did not provide the necessary foundation for the instruction tendered by defendant.

¶ 79    Because the disputed issue was knowledge and the evidence did not raise an issue regarding voluntary possession, the meaning of defendant's proffered instruction would have been unclear and the submission of the instruction would have confused the jury. See *Bui*, 381 Ill. App. 3d at 426; see also *Redmond*, 73 Ill. App. 3d at 177. For these reasons, we cannot say that the circuit court abused its discretion by refusing to tender IPI Criminal 4th No. 4.15.

¶ 80    Finally, even assuming, *arguendo*, that there was error in refusing defendant's tendered instruction, we agree with the State that any error was harmless. The evidence showed that, although defendant did not live at the residence, he was present during the search and the pipe—that defendant admitted belonged to him—was found inside of his bag. This evidence overwhelmingly proved defendant guilty beyond a reasonable doubt. In addition, we reiterate that the instructions given at defendant's trial would not have allowed the jury to find that defendant knowingly possessed methamphetamine if it believed he was unaware that the pipe was in his bag. Therefore, we fail to see how the result of defendant's trial would have been different had the jury been instructed on possession as a voluntary act.

¶ 81                                III. Conclusion

¶ 82    For the foregoing reasons, we hereby affirm the judgment of the circuit court of Lawrence County.

¶ 83    Affirmed.